Mullins et al. v. Cottrell.

Mary A. Mullins *et al.* v. Louisa Cottrell.

1. Last will and testament: insanity: delusion, what.—Whenever a person conceives something extravagant to exist, which has no exist-

Mullins et al. *v.* Cottrell.

ence whatever but in his own heated imagination, and is incapable of being permanently reasoned out of the existence of such conception, such a person is said to be under a delusion.

2. SAME : SAME.—No eccentricity or peculiarity of character, no degree of moral depravity or of unnatural feeling, not amounting to destitution of reason nor mental incompetency to do the particular act, is to be considered as insanity.

3. SAME : SAME : SAME.—The existence, without any real or apparent cause, of a delusion in the mind of a testator, so that his testamentary duties are influenced thereby, and who upon all other subjects is of sound mind, will render him incompetent to make a will, the offspring of such delusion.

4. SAME : EVIDENCE TO ESTABLISH DELUSION.—A party impeaching a will on the ground of insanity of the testator, must establish such insanity by the clearest and most satisfactory proofs.    The proof is more difficult when the will is impeached on account of the partial insanity of the testator, his general soundness of mind being conceded.

5. SAME : EVIDENCE TO ESTABLISH DELUSION WHEN THE WILL IS IN HANDWRITING OF TESTATOR.—More strictness and fulness of proof of the unsoundness of testator's mind is required where, in addition to the general sanity of the testator and proof of his capacity at the time of execution, and where the dispositions of the instrument are reasonable on their face, the will is in his handwriting.   In such a case, the existence of a delusion at the time of execution should be clear in point of existence and decided in character beyond all doubt.

6. SAME : SANITY OF TESTATOR : CONVERSATIONS AND RELIGIOUS CREED ADMISSIBLE AS EVIDENCE.—Upon a question of sanity, the conversations of the party whose act is involved upon any subject tending to show his state of mind, is admissible as evidence.   Sanity is not to be determined by religious creed unless it be so absurd as to afford evidence of unsoundness of mind, though it is proper to admit testimony on such an issue as to the religious opinions of the party, under proper instructions of the court as to the effect to which it is entitled.

7. SAME : EVIDENCE OF WANT OF REAL OR APPARENT CAUSE FOR DELUSION. —When a will is impeached on account of the existence of a delusion in the mind of the testator, testimony tending to show the want of real or apparent cause for such delusion should always be admitted.

8. SAME : EVIDENCE : RES GESTÆ.—When part of a conversation is introduced as evidence, it is admissible for the opposite party to draw out all that passed during the conversation ; and if the opinions of the witness, thus expressed, were incompetent, they may be excluded on motion, or the jury instructed to give no weight to them.

9. WITNESS : TESTIMONY OF, HOW IMPEACHED ON ACCOUNT OF BIAS OR ZEAL.—Before the credibility of a witness can be impeached on the ground of bias or zeal in favor of the party calling him to testify, he must be interrogated as to the supposed bias or zeal, and thus lay the foundation for the admission of other testimony to show his bias or zeal and to contradict his

Mullins et al. *v.* Cottrell.

statement. 8 Iredell, 302 ; 37 Miss. R. 383 ; 2 Phill. Evid. 904, 905 (4 Am. ed.).

10. MISCONDUCT OF JURY: EVIDENCE TO ESTABLISH MUST BE CLEAR BEFORE VERDICT WILL BE SET ASIDE.—The clearest proof of the misconduct of the jury or some member of it, is required to justify the setting aside of their verdict.

11. INSTRUCTIONS TO JURY: MEANING OF TECHNICAL TERMS MUST BE EXPLAINED.—In a charge to the jury which contains technical terms, differing in meaning from their popular use, the court should direct them as to the meaning of the terms used.

12. LAST WILL AND TESTAMENT: LEGAL PRESUMPTION AS TO SANITY: INSANITY, WHEN ONCE SHOWN TO EXIST, PRESUMED TO CONTINUE UNTIL CONTRARY IS SHOWN.—The law presumes all persons to be of sound mind until the contrary is proved. When insanity is once shown to exist, it is presumed to continue; the presumption may be removed by proof of a change of mental condition, or the existence of a lucid interval at the time of the act which is called in question.

APPEAL from the Probate Court of Marshall county. Hon. Thomas A. Falconer, judge.

On the 2d November, 1865, appellant presented the will of Peter McQueen for probate, in the Probate Court of Marshall county. The will has date 3d September, 1863, and bequeaths all of testator's estate in trust to appellant, to pay funeral expenses and debts, " and to assume the management of the residue of my estate, and apply the profits, or income, which she (appellant) may realize by so doing, to the use and support of herself and her four infant children (naming them), and then, as her above-mentioned children may arrive at the age of majority, to pay to Stephen W., Matilda H., and Mary P., each one-sixth part, and to Pauline one-third part, of my estate, and retain one-sixth part for her own use and benefit." Appellant was appointed executrix.

Appellee, on 21st November, 1865, filed her petition contesting the validity of said will, alleging that she was the only surviving child of testator ; that testator and appellee's mother were married some forty years ago, and lived together until after the birth of herself and a deceased sister, and then he abandoned his home for many years, returned, took his children from their mother, placed them at school in Marshall county

for three years, and then took them to his home; that she and her sister were dutiful and obedient, did nothing to forfeit his esteem and protection; that in 1840, by their parent's consent, they visited the family of Major Rowlett, to remain a few days; whilst there they went with the family to night meetings once or twice, and that for this their father drove them from his home.

The petition charges that, in reference to domestic relations, testator was laboring under mental derangement, and was insane and deluded, and that the paper presented as a will is the offspring of that delusion.

That he resided in Choctaw county two years previous to his death; killed a man in that county, and was killed in attempting to escape. That her mother and sister are dead, and that she is the sole heir of testator.

The answer of appellant states that the paper presented is the will of Peter McQueen; that he was sane; denies that he was under any delusion or mental derangement.

An issue of "*devisavit vel non*" was made up. Counsel agreed that the cause should be tried on its merits, and that all technicalities should be waived.

The opinion of the court contains the substance of all the testimony adduced on the trial of the cause.

Court gave the following charges for appellee:

1. The law presumes all persons to be sane or of sound mind until the contrary is proved; and if the jury believe that Peter McQueen, prior to the time of making the will, labored under an inveterate insane hatred and delusion of mind as to his daughters, then to sustain the paper propounded as a will; a lucid interval at the time of making the will must be proved to the satisfaction of the jury, and the burden of proving such lucid interval is in the parties propounding the will for probate.

2. That, in legal contemplation and in fact, a person may be both sane and insane at the same time upon different subjects.

3. One criterion distinguishing a sound mind from an insane one, is the presence or absence of delusion. A person who

has conceived imaginary things to exist, which exist only in such person's imagination, and of the non-existence of which neither argument nor proof can convince him, is laboring under delusion, and to the extent of such delusion is of unsound mind, though upon all other subjects such person may be free from delusion and of sound mind.

4. That whilst a very low order of intellect, if there is no unsoundness of mind, is sufficient to enable a person to make a valid will, no strength of mind or business capacity or general intelligence, however great, will constitute testamentary capacity, if the party was laboring under insane delusion as to one point, and the will is the direct offspring of that delusion.

5. Peter McQueen, if of sound mind, had a right by his will to give his estate to whom he pleased, regardless of the claim or wishes of all other persons; but in deciding upon the state of mind when he made the alleged will, the jury should look to the contents of said paper, and to the natural relations and reciprocal duties and obligations of parent and child, as well as to all the other testimony before them touching the issue which they are sworn to try.

6. Will be found in the opinion of the court.

7. That the jury are the exclusive judges of the credibility of the witnesses and of the weight of the evidence.

The jury returned a verdict against the validity of the will. A motion for a new trial made and overruled, and an appeal taken to this court.

*Featherstone, Harris,* and *Watson,* for appellants, contended:

1. That the verdict was contrary to law and the testimony.

The issue presented was, whether or not the testator was insane or deluded on the subject of his daughters at the time of making the will, and was the will the direct and immediate offspring of that delusion? The burden of proof was on the contestants, and to warrant a verdict in her behalf, the testimony should have been of the *clearest and most satisfactory character* as to the delusion, the extent of it, and that the will was its direct and immediate offspring. Williams on Execu-

tors, 16; *Goss* v. *Goss*, 3 Humphrey, 278; *West* v. *Moore*, 37 Miss. R. 114; 6 Georgia R. 324; 11 Ib. 344; 7 How. 636.

If the will be in the handwriting of the testator, and reasonable in its provisions, it raises a strong presumption in favor of the sanity of the testator. 1 Hen. & Munf. 476; 2 Starkie's Evidence, 932.

The law places the attesting witnesses with the testator to observe his conduct, conversation, and mental condition at the time of making the will, and attaches more weight to their testimony than it does to that of casual observers to whom the trust has not been committed. *Broch* v. *Suchett*, 4 How. Miss. 459; *Exum* v. *Canty*, 34 Miss. R. 569; *Terry* v. *Buffington*, 11 Georgia, 341.

Less capacity is required in case of a will than in that of a contract. *Potts* v. *House*, 6 Georgia R. 324; 20 Ib. 709; 4 Grattan, 106; 9 Ib. 330; 11 Ib. 220; 4 McCord, 107; 31 Ala. 59; 5 Ib. 81; 17 Ib. 84; 4 How. Miss. 457.

Eccentricity of character, habits, or opinions furnishes no evidence of insanity. *Potts* v. *House*, 6 Georgia, 350: *Lee* v. *Lee*, 4 McCord, 183; 4 Grattan, 120 Taylor's Med. Jurisprudence, 649.

These legal principles were applied to the testimony, and it was argued that the verdict was not sustained by the testimony.

2. That the court erred in giving the first and fifth charges.

The first charge assumes the existence of a fact (the existence of lucid intervals in the mind of the testator) which was not warranted by the proof; it changed the burden of proof of the insanity from appellant to appellee, and was calculated to mislead the jury. 23 Miss. R. 524; 35 Ib. 506; 30 Ib. 361.

The fifth charge announces repugnant and contradictory legal propositions, charges as to the weight of certain testimony, and was calculated to mislead the jury. 17 Al. 84; 13 Ib. 68; 5 Gill & Johns. 260; 11 Georgia, 344.

3. The admission of testimony as to the religious opinions of the testator was erroneous. *Goss* v. *Goss*, 3 Humph. 278.

4. Testimony as to the character and conduct of the appellee after her expulsion from the home of her father was inadmissible. The question at issue was, whether or not there was

Mullins et al. *v.* Cottrell.

any foundation for the supposed delusion of testator as to his daughter. She may have been a fiend incarnate before the expulsion, and that act of merited severity may have changed her into an angel of light: 11 Georgia, 342.

5. The exception in reference to the testimony of witness Coleman, was well taken. Witnesses are required to state facts, not opinions. 36 Miss. R. 471.

6. Appellee should have been permitted to show the bias of the witnesses called to testify for appellant.

7. That the cause was not tried by an impartial jury, and for this reason a new trial should be granted. 38 Miss R. 227; 26 Ib. 299 ; 37 Ib. 369; 9 S. & M. 115 ; 13 Wend. 351; 11 Leigh, 714 ; 10 S. M. 25 ; 3 How. Miss. 37.

*Watson & Falconer, Walter* and *Scruggs,* for appellant, contended:

1. The sixth assignment of error not well taken. The affidavit of Read is wanting in distinctiveness and certainty. Witness states " that his impression is he heard," etc.

Appellee should have shown by proper affidavits, that the objection to the juror was not known to herself and counsel at the time the jury was being impanelled. 2 How. Miss. R. 773 ; 13 S. & M. 286–9 ; 38 Miss. R. 227 ; Rev. Code, 503, art. 152.

2. The testimony as to the bias of the witnesses was properly excluded.

" It is improper to prove the bias, prejudice, or improper interest of a witness, where he has not been examined on that point, so that he and the party offering him might have an opportunity of explanation." *Edwards* v. *Sullivan,* 8 Iredell, 302 ; 2 Phillips' Ev. 961–962.

3. The answer of the witness Coleman to the question of testator was properly admitted as testimony. It was not the admission as testimony of the opinion of the witness as to the conduct of testator in hanging the negro, but it was giving to the jury all that passed in the conversation between testator and witness.

4. When the question at issue is the sanity of the testator,

great latitude of proof will be allowed.  1 Jarman, 79, 80, 81;
2 Greenleaf's Ev., § 37; 2 Redfield on Wills, 371; *Dew* v.
*Clark*, 3 Eng. Eccl. R. 79; *Goss* v. *Goss*, 3 Humph. 278;
*Mercer* v *Kelsoe*, 4 Grattan, 106.

Religious opinions of testator are admissible to show his
eccentricity of character.  Eccentricity assists materially in the
proof of partial insanity.  3 Eng. Eccl. R. 485.

5. The reasonableness of the will, in view of the condition
of the testator's family and their natural claims upon him, is to
be considered by the jury in a case of doubtful mental capacity.
1 Littell (Ky.), 372-3-4; 2 Eng. Eccl. R. 452-4.

6. The charges asked by appellee were properly given by
the court.

The 1st charge is sustained by the following authorities:—
1 Jarman, 67, 68; 4 Call. 426; 30 Ala. 237.

The 2d charge, by *Dew* v. *Clark*, 2 Eng. Eccl. R. 443; 2
Redfield on Wills, 75, 76; 6 Georgia, 357; 1 Littell (Ky.), 373.

The 3d charge, by 2 Eng. Eccl. R. 441-2; Shelford's Law
of Lunatics, 39, 40, 41; Wharton & Steel's Med. Jur. 14; 24
Ala. 241; 2 Redfield on Wills, 71.

The 4th and 6th involve the same principle as the 3d.

The 5th charge, by 1 Jarman, 82; 5 Gill & Johns. 269–301;
Shelford, 279; 7 Richardson, 474.

7. The verdict was according to the law and evidence.

Partial insanity will invalidate contracts generally, and will
be sufficient to defeat a will, the direct offspring of that insanity,
although the testator was sane in other respects upon ordinary
subjects.  Shelford, 296; Redfield on Wills, 71, 79, 80; 1 Jar-
man, 60;  2 Eng. Eccl. R. 436;  24 Ala. 241;  1 Littell, 372;
6 Georgia, 325.

Insane delusion consists in the belief of facts which no ra-
tional person would have believed.  Shelford, 40; Redfield, 87;
3 Humph. 283–4.

" In most cases of delusion, the delusion founds itself orig-
inally in some slight circumstance, the magnifying of which
beyond all reasonable bounds is nearly or quite as good in proof
of its being a delusion, as the taking up of some absurd pre-

judice, which is entirely unfounded, and that rests upon no basis." Shelford, 41; 2 Eng. Eccl. R. 474.

Great irritability, violent passions, eccentric habits or suspiciousness are strong indicia of the continuance of insanity. 1 Jarman, 74; Shelford, 292, 293.

Counsel commented on the testimony at length, and insisted that it established the delusion of the testator as to his daughters, that it was unfounded, that he could not be convinced of his error, and that the paper propounded as a will was the direct offspring of that delusion.

HANDY, C. J., delivered the opinion of the court.

This is an appeal from a decree of the Court of Probates of Marshall county, annulling a written instrument propounded by the appellant, Mary A. Mullins, as the last will and testament of Peter McQueen deceased, in which she was appointed as executrix.

To the petition propounding the will for probate, the appellee filed an answer, stating that she is the only child and heir at law of the deceased; alleging that he was, on many subjects, of unsound mind, and that the paper offered for probate was the direct offspring of the delusion and derangement of mind under which he was laboring for a long series of years, and at the time of the writing and execution of the paper. The answer proceeds to state acts of ill-treatment towards the respondent, and other acts, which it alleges proceeded from the unsoundness of her father's mind and the delusion of which he was the subject; prays that an issue *devisavit vel non* be made up, and, by way of cross-petition, that the alleged will be annulled. On the answer of the appellants, the executrix and beneficiaries of the will denying the allegations of the answer of the appellee, an issue of *devisavit vel non* was awarded, and on the trial the verdict was against the will. The appellant thereupon moved for a new trial on various grounds; that motion was overruled, and a decree rendered, cancelling and annulling the paper as an invalid will.

By this paper, all the property of the deceased was left to Mrs.

Mullins, who is his niece, and her four infant children, to the exclusion of his daughter, the appellee, but without naming her in it. It appears that it was executed on the 3d September, 1863, and that he died in the autumn of 1865, an old man, and possessed of considerable property; that the instrument is entirely in his handwriting, and that his niece and her children, the appellants, had lived with him since the spring of 1861.

It is admitted, that the instrument was executed with all the forms required by law; and it appears that it was attested by six subscribing witnesses, whose attestations—three at one place, and three at another—were made at the personal solicitation of the testator.

His general sanity on most of subjects is also admitted. But it was insisted, in opposition to the will, that he was a *monomaniac*, and insane upon the subject of his daughters, one of whom died in 1850, and the other, the appellee, survived him; and that this will is the direct offspring of that partial insanity. And this is the issue presented in this record.

On the trial before the jury in the court below, four of the subscribing witnesses testified that they considered the testator to be of sound mind at the time of the execution of the will. Two of them expressed doubts on the subject—B. L. Milam and John H. Miller. These witnesses testified that they neither saw nor heard anything at that time calculated to raise any suspicion of the sanity of the testator. But, from statements made by him to them before and afterwards, about hanging a negro during the war, from his denunciations of the Methodist Church, and from the fact of his having driven his daughters from his house, they had doubts of his sanity on the subject of his daughters.

Six witnesses, who lived in the immediate neighborhood of the deceased at the date of the will, and near him, and were well acquainted with him, saw him very frequently, and several of them conversed with him about discarding his daughter and hanging the negro, and on almost all other subjects, testify fully as to his mental capacity on all subjects, at that time, and during all their acquaintance with him, which had been for

years. More than thirty other witnesses, who had known him well for many years and for various periods, testify not only to his sanity during all the time they had been acquainted with him, which, with many of them, had been for more than twenty years, but that he was a man of superior intelligence and of high order of mind. These witnesses were, many, if not all of them, men of character and intelligence. One of them said, "if the deceased was not a sane man, there was not one to be found in all the land." Another stated that, "if he was insane on any subject, witness had never seen a man in his life who was sane." Nearly all of them express themselves decidedly in favor of his sanity and intelligence, with the most ample opportunities to form an opinion on the subject, and state that they never saw any change in his mental capacity during all the time they were acquainted with him, and never heard his sanity questioned, or that it was suspected by any one, until this controversy about the will was raised. The witnesses above referred to speak of him whilst he lived in two different neighborhoods, at different times, in Marshall county. In 1864 and 1865, he resided temporarily in Choctaw county, where he had taken refuge to save his property from the enemy; and several other witnesses there, who lived in his neighborhood, testify fully to his sanity and superior intelligence.

Several letters of the deceased were read in evidence by the propounder, mostly addressed to her, which show attachment to his relatives, correct moral sentiments, enlarged practical views, and intelligence and cast of mind much above the common level.

Many of these witnesses testified that he had been a merchant, and had made money by the business; that he had been a successful planter and had accumulated property; that he was intelligent and even shrewd in his contracts, and that he was never considered deficient in mind or judgment. One of them, Dr. Stewart, a physician of twenty years standing, and for fifteen years his family physician, intimately acquainted with him by visiting his family, by day, and by night, in his practice, and by talking with him on nearly all subjects, stated that he was a

man of more than ordinary mind and intelligence, and that he managed his private affairs and property well and successfully, and that it was witness's opinion that his mind was sound on all subjects, and that he was neither insane nor deluded on the subject of his daughter.

Several of the witnesses testified that he was a firm and decided man in his opinions, and stubborn and obstinate in adhering to, and maintaining them—a warm friend and a bitter enemy.

Many of the witnesses testified that they had an unfavorable opinion, at one time, of him, in regard to his daughters, and his having driven them from his house; and they called on him with a view to produce a reconciliation between them, and talked freely with him on the subject, but that he satisfied the witnesses that he was right and his daughters wrong; that he stated he had driven his daughters off for disobedience to him, and for taking the advice of others, and not his; and that he had told them not to attend night meetings unless he went with them, or they went in charge of some one selected by him, and in whose charge he was willing to risk them; and that in this they had disobeyed him, and gone to his enemies for counsel. To other witnesses he stated, that he did not intend to give his property to his daughter, the appellee, unless she had children; that she was married, and had no children, and was provided for; that her disobedience to him had forfeited any right to his property, and that he intended to give it to his own relatives, and did not intend that it should go to the Cottrells, meaning her husband and his relatives.

The witnesses testified that, during these conversations in relation to his daughter, he spoke coolly, rationally, and calmly, and with no nervous excitement of the face; and some of them stated that he seemed rather sad when speaking on the subject. And it appears that he spoke on the subject to but few of the witnesses, even to his neighbors and intimate acquaintances, unless they mentioned it to him.

The medical witnesses, Doctors Stewart and Scruggs, gave it as their opinion, that when a man is *deluded* or insane on any

one subject, he will generally become excited, and give evidence of insanity on that subject, whenever it is presented to his mind.

On the part of the contestant, it was shown that the deceased came to Marshall county in the year 1837, and brought with him his two daughters, the contestant, then about sixteen years of age, and her sister Melissa, then about thirteen years of age, whom he placed at the boarding-school of Mr. Benjamin Cottrell, in that county, where they remained for three years, during the first two of which they were pupils in the school, and for the last year they were parlor boarders. In placing them at the school he directed that they should not be permitted to receive letters unless first examined by the teacher, and requested that he would not permit them to read the Bible; but the teacher refused to receive them on this latter condition, and he did not insist on it. During their stay there he was kind and attentive to them, visited them regularly, and furnished them with necessaries suitable to their ages and station, and when absent from home, wrote kind and affectionate letters to them. He was engaged in the mercantile business, first at Hudsonville, and afterwards at Mount Pleasant, in said county, to which latter place he took his daughters in 1840, and they lived with him there for two years. In the summer of 1842 he left the State, for the purpose of purchasing goods, and placed his daughters in the family of Mrs. Rowlett, a respectable married lady residing in Mount Pleasant, and they spent the summer there. During that time they attended church with Mrs. Rowlett, both day and night—there being protracted religious meetings then going on—and made a profession of religion. He sometimes attended church with them in that year. On his return home in the fall, he requested them not to attend night meetings at church except with him, or with some one with his approbation. After this they visited Mrs. Rowlett's family again in the fall of 1842, and whilst there they attended meetings two nights in succession, with the family; and shortly afterwards, and whilst they continued there, they received a letter from him, stating that "by their disobedience and dissi-

mulation they had forfeited all claims to his protection, confidence, love, or even sympathy," and that he therefore " desired never to see them again, and to hear from them as seldom as possible ; " that their " apparel was packed up in trunks, and placed ready to be sent to them at any place they might designate ; or ready for them when they might see proper to send for it ; and, if they desired it to be sent to any place besides the one at which they were, to let him know, and he would furnish the means of conveyance." He then proceeds in the letter to admonish them in relation to their duties and obligations resulting from their profession of religion, that they should " scrupulously examine the Scriptures, and see what their duty was ; " enjoining upon them especially the duty of obedience to parents taught by the Scriptures, and which he says " they have ever manifested a disposition to violate, and have violated since they professed religion." The letter goes on to say, that he did not intend to give them anything like worldly riches ; counsels them to " walk humbly," to which end they " must be poor ; " that " their clothing should not be costly, for fine clothes would produce pride ; " and in order to humble themselves, " to work for every thing they got ; for, when they labored hard, they were sure to be humble ; " and it concludes by saying : " If you need any clothing let me know, and I will furnish such as I think will suit religious persons best."

It appears that the night meetings referred to were conducted in an orderly manner and were attended by the best people of the country ; and that when his daughters went to Mrs. Rowlett's in the summer, he had not expressed to her any objection to his daughters attending church at any time.

In addition to these facts, the evidence on the part of the contestant, so far as it is material to state it, is, in substance, as follows :

Benjamin Cottrell testified that he received a message from the daughters, after the above letter was written, to come and see them—that he found them at Rowlett's, and said to them he thought he could settle the difficulty at once, and that the contestant in this case replied, if he knew as much as she did he

would not go to see her father.   Witness went and found him
entirely irreconcilable, and he said he "would as soon see his
daughters in a brothel as in the Methodist Church as members."
Witness did not see a spark of rationality in him on the occa-
sion when speaking of his daughters; he left him and never
saw him again to speak to him.   The daughters came to wit-
ness's house to live shortly after this.   Melissa died ten or fif-
teen years before her father, and Louisa married witness's brother
in 1856.   While they were at witness's school they behaved
well and were obedient to the rules of the school.   Dr. Cottrell,
contestant's husband, died in 1863, and left her a small tract
of land, six or eight negroes, some stock, some debts and some
money—the debts being stated by her to be about $400 or $500,
and the money $1000.   The witness further stated, that in 1840
deceased brought from Virginia some twelve negroes, to witness's
house, and stated to witness that they were for his daughters,
and asked witness to act as their agent or trustee in managing
them—which he refused to do; that the slaves were afterwards
attached for the debts of the deceased, and witness was sum-
moned to court to prove that they were not his, but his chil-
dren's, and the negroes were released.   One of the daughters
asked the father when the negroes were brought to witness's
house, .what had become of the two negroes their grandfather
had left them, and he replied, he had sold them ; that after-
wards, in the interview with the deceased in the fall of 1842
above spoken of, witness asked him what he was going to do
with the negroes that belonged to his daughters and which he
had given them, and he said "he would be d—d if he had given
his daughters any negroes."

Mrs. Rowlett testified that the daughters were amiable and
dutiful, for aught she knew to the contrary ; that she was not
aware that the deceased had objections to his daughters going
with her to Methodist meetings, in the summer of 1842, as he
had left them with her without restrictions ; that, after his
daughters received the letter from him above stated, she wrote
to him interceding for them, and he replied, desiring to be in-
formed upon several points as to his daughters having attended

night meetings, and having professed religion, and whether she and her husband believed that he would be pleased to hear that his daughters had attended a Methodist meeting after night, and, under the influence of the preaching, had become converts; to which she replied as above stated, and they never spoke afterwards to each other; that witness knew nothing of his temper and disposition; that the daughters remained at her house several weeks and received nothing from their father; that their trunks were neither brought nor sent to her house; that witness's husband bought them clothes while they remained there; that deceased proposed to give them clothes, and told them that bagging was the most suitable for religious persons.

The contestant was introduced as a witness, and testified that she and her sister, whilst at their father's house in 1842, made it their study to please him, to obey his commands and to carry out his wishes; that they went to church, and their father went sometimes with them; that he requested them not to attend night meetings, except with him; that they desisted, though they had previously been going with two families there; that in the fall of 1842, after their father's return home, they went on a visit to Rowlett's family, with his consent, and while there, that they attended meetings for two successive nights, with Rowlett's family, without knowing that it would be offensive to their father; that they received the letter above stated expelling them from his house, and sent for their trunks, and they had been broken open—by whom she does not know—and had but little in them; that she went on one occasion with Mr. and Mrs. Hardy to see her father, while he was sick, but did not see him; that he declined to see her; that on another occasion she went with Swan to see him, spent several hours with him, and dined with him, Dr. Smith being there; that she was alone with him most of the time; that he asked her why she married without his consent, and she replied that she did not suppose he wanted to be consulted about it, as he had driven her off; that he asked her who told her he had driven her from his house; that she told him, and he said it was a d——d lie, that he had never sent her any such word; that she called his attention

to the letter, and he said he had never written any such letter; that she had no children.

Mrs. Hardy testified that she knew the deceased, had lived in his neighborhood many years; that she did not like him for his rough ways and cursing in the presence of his daughters, and for trying to persuade her husband that the Methodist Church was wrong; that she went with the contestant in 1860 to see him, he being quite sick and low, and had been for some time; that when she asked that his daughter might come in to see him, he replied, "damn it, she will poison me, she only wants my property;" that his daughter did not see him then; that he afterwards told witness, in 1860, that he did not care about his daughter's professing religion or joining the church; that he had not driven her off for that, but for going to his enemies for advice and protection; that, on witness's first visit to him in 1860, when she attempted to bring about a reconciliation, he became much excited; when speaking of his daughter, his face turned purple and the muscles swollen; that he afterwards said to witness in the presence of Swan, "my daughter was over to see me a few days ago, but I guess the madam won't come back again;" that witness thought him unjust to his daughter; that he had a head as long as a fence-rail, but there was a screw loose with him, something wrong; that she thought him a peculiar, mysterious, and singular man.

B. Hardy testified that he had known the deceased from 1848 to 1865 well, and lived in his neighborhood, and had conversed with him on nearly all subjects and had heard him converse with others; that he thought him a man of strong will, strong passions, high temper, strong prejudices, a bitter enemy and a warm friend, rather eccentric in his views and habits; that he had heard him speak of hearing on his place the report of the guns at Fort Sumpter and Pensacola during the late war, but could not say whether he was quizzing; that he looked serious, but was fond of joking and quizzing people; that witness's opinion was, and always had been, that he was sane, and capable of making a will or of transacting any kind of business, and always thought him a man of mind and information; that he

had managed his own estate and private business well, and enlarged his estate; that he had heard him speak of the difficulty with his daughter; that he said he wanted nothing to do with his daughter; that he went to see him in relation to her in 1856 and again in 1860, and at the latter visit he refused to see her, and said "damn her, she wants my property."

B. L. Milam, a subscribing witness to the will, testified that he had but little acquaintance with the deceased; that at the time of the attestation of the will, his wife refused to attest it after reading it, because he had not given his property to his daughter, and he replied that she was married, had no children, and was well provided for; that after attesting the will, witness was alone with him, and the conversation turned on his daughter, and he said he had driven them off for disobedience, and mentioned their attendance at night meetings against his orders; that he denounced the Methodist Church very bitterly; that he told witness and others the same evening, about his hanging the negro for going to the enemy during the late war; that it was the second time he had run away, and he had told him he would hang him if guilty a second time; and the witness states the particulars of the hanging as detailed by the deceased, showing great cruelty; and that his object was to deter other negroes from a like offense.

T. Swan testified that he asked the deceased if he might bring his daughter to see him, and he consented; that he went with her and saw them meet; that deceased took her hand and placed it on her chair, but witness saw or heard nothing further; that, in conversation with him, he said she had married Cottrell without consulting him; that she was provided for, and had no children; that his property should not go to the Cottrells, but he would have given her property if she had had children.

Thomas Coleman testified that he met the deceased twice about twenty years ago, and the conversation turned on religion and the churches. The appellant objected to the statements of the deceased on these subjects, but her objection was overruled, and exception taken. Witness stated that the deceased denounced the churches as corrupt; that deceased did not believe in a

state of future rewards and punishments, but was an infidel; that witness met him again in 1863, and he asked direction about the roads, and said he did not want to travel the public highway for fear of the enemy; he told witness about hanging the negro, and if the enemy caught him, they would hang him; that he stated all that was done in hanging the negro, and that he had invited his neighbors to bring their negroes to see it for the sake of example, and to deter negroes from running away to the enemy; that he asked witness whether he had done right. When the witness was about to state what he had said, objection was made on the part of the appellants, because the opinions of the witness were not competent evidence. The objection was overruled, and exception taken.

The witness then stated that he told him he did wrong; to which the deceased replied that if all persons had done as he had done, the negroes would stop running to the enemy; that witness was a member of the Methodist Church.

Hugh Davis testified that he staid two or three days with the deceased in the same room, in Memphis, in 1863, and he told witness about hearing the report of the guns at Fort Sumpter and Pensacola, on his plantation in Marshall county; that his hearing was very acute; witness did not know whether he was quizzing or not, but he appeared serious.

Dr. A. T. Scruggs testified that he knew the deceased from 1843 to 1861 or 1862; was not intimate with him; did not visit and never lived nearer than ten miles from him; met him frequently on public occasions, and conversed with him and heard him converse with others; thought him a very peculiar man, very eccentric, stubborn, and dogmatical; heard him speak of his daughters, and thought he was morally insane and deluded, or insane on that subject, and incapable of making a will where they were involved; based his opinion on his conversation and appearance; thought his nervous system was too active; too much rigidity of the nerves in his face and countenance, and too much twitching of the face when the subject of his daughter was mentioned; that persons deluded, as a general thing, will show excitement when the subject is men-

tioned.   Witness has been a physician and Methodist preacher for twenty years; had talked with the deceased on religion and politics; he was very bitter in his denunciations of the church; witness had suspected him of insanity before his death, but never mentioned it; that he had early regarded him as laboring under mental delusion, amounting to monomania, and had, therefore, studied his mind; his rigidness of muscles, and excitement and appearance of his eye, indicated an unhealthy state of mind; thought him a man of superior intellect, and sound upon all subjects but one and its kindreds, his children.

Mr. Echols testified the same as the witness Davis in relation to hearing reports of guns at Sumpter and Pensacola, and that he heard the deceased speak very extravagantly of pills he had made, which he said would cure all diseases; but he did not speak more extravagantly than is usual with inventors of patent medicines.   Witness was a Methodist preacher, and had heard years ago of the treatment by deceased of his daughters, and thought from the facts stated that he was laboring under some mental delusion; contestant is a very estimable lady, and her husband is a worthy gentleman of fine character; had heard years ago of the difficulty of the deceased with his daughters, and of his denunciations of the Methodist Church; and witness admitted that his opinion as to the relations of deceased and his daughters was founded on rumor, but did not believe he was capable of making a will where this daughter was concerned.

N. McCombs testified that he knew the deceased from 1839 to 1862; lived near Mount Pleasant, and bought goods of him there from 1840 to 1844; saw him and conversed with him often; thought him a man of strong passions and prejudices, stubborn, and when he had taken a notion there was no moving him; he once referred to the difficulty with his daughters, casually; he looked sad, and witness thinks shed tears; does not think he could have done any one justice when he was prejudiced against the person and an enemy; does not think him capable of making a will, so far as his daughters were concerned; that he could not do them justice; speaks well of the character of his children and of Dr. Cottrell; deceased was a warm friend of

witness, but witness was afraid of him, he was so bitter and easily excited that there was no reason in him.

Dr. Charles Stewart testified that he had heard the deceased speak of the reports of guns above mentioned, but he regarded it as a joke; he was a great quizzer and looked serious at the time.

Dr. Benjamin Smith testified that he had been a practising physician; knew deceased for several years, not intimately; had met him and talked with him, and heard him talk to others; they never visited; thought he was laboring under mania, which witness defined to be moral insanity, and that a man might be morally insane, destitute of moral feeling, and still have a very clear, sound intellect; lived at Mount Pleasant when the difficulty occurred between the deceased and his daughters; knew the daughters, and speaks well of their character for correct and amiable young ladies; speaks of the good character of Rowlett's family, and of the orderly character of the meetings referred to; the deceased was a singular man, of violent temper; heard him speak of the reports of guns, as if he believed it; did not think him possessed of soundness of mind sufficient to make a will as far as his daughter was concerned; conversed with the deceased in 1860 about his daughter, and he was sick; he refused to see her; afterwards witness went with her, and she spent several hours with him, and dined with him; they conversed in private; when she came out she appeared as though she had been crying; he treated her before company as a stranger, but politely; could not have told that she was his daughter; Dr. Cottrell stood as fair as any man in the community.

B. D. Matthews testified that the deceased was high-tempered and of strong prejudices, and eccentric; had more personal difficulties than he ought to have had; heard him speak extravagantly of his pills; thinks his mind was not well balanced; never heard him speak of his daughter.

Rev. C. B. Harris testified that he had conversation with the deceased in 1863; talked about hanging the negro, and of his daughter; thought he was an atheist; thought there was a screw loose about him; he cursed in presence of witness's son, but

desisted when requested; witness is a Methodist preacher; heard deceased speak of the reports of guns above mentioned.

Wm. Crump testified that he met the decedent about twenty-four years ago; talked with him on matters generally, and religion in particular; thought him a character, and drew him out; did not believe he was right mentally; there was a screw loose; could only remember that the deceased thought it was right to take any advantage in a trade.

B. G. Laurence testified that he knew the deceased at Mount Pleasant, in 1838, and up to 1865, and was a merchant there all the time deceased was; thought him an eccentric man, of high temper, strong will and stubborn in his opinions when once formed; had heard him knocking in the back room of his store late at night, which, when asked, he said was to keep out the witches; he was a man of good character, and managed his affairs well; witness thought him sane, and capable of making a will; says the meetings, which the daughters of deceased attended, were well conducted and orderly; the Rowlett family stood fair, and the daughters of the deceased were highly respectable young ladies, and esteemed by the community.

In rebuttal Dr. Charles Stewart, W. Durham, W. L. Miller and R. G. Miller testified as to the manner and appearance of the deceased, when speaking about the difficulties with his daughters; that there was no excitement in his looks or manner, no twitching of the nerves of the face, and that he talked calmly and rationally, but seemed rather sad; that they had heard him speak about the reports of the guns, but considered it a quiz or joke, in which he was in the habit of indulging.

Wm. L. Miller stated that he gave witness as a reason for his hatred to the Methodist Church, that when he was selling goods at Mount Pleasant, they had dealt with him, and run away and swindled him worse than any part of the community, when he expected more of them than he did of the world; that his hatred of dishonesty, hypocrisy, and swindling, was very great.

We have been thus particular in stating the testimony on the part of the appellee, even to prolixity, because the merits of the case materially depend on a full consideration of it.

The first error assigned is, that the court overruled the appellants' motion for a new trial on the ground that the verdict was contrary to law and the evidence in the case.

In determining this question, we must, first, consider the rules of law applicable to cases of the character of that presented in the record; and, secondly, examine the evidence, and see whether it, according to the rules of law, sustains the theory by which the will propounded has been pronounced invalid.

The theory on which the will is alleged to be invalid is, that the testator—though of sound mind upon all other subjects, as it is conceded he was—was in a state of *delusion* in relation to his daughter, and wholly incapable of doing any legal act in which her interest was involved; and that this will, which would deprive her of all benefit of the estate to which she was justly entitled, was the act of a *monomaniac* impelled by the insane delusion towards his daughter which was the cause of its execution. It is said that the testator, at the time of making the will, was laboring under an *insane hatred* or *aversion* to his daughter, the offspring of a wild and totally unfounded idea that filled his mind, that she had been disobedient and undutiful, and consequently had lost all claim to his kindness and protection.

Let us examine some of the principles by which the presence or absence of this state of the mind is to be tested.

In the noted case of *Dew* v. *Clark*, 3 Add. 79; 2 Eccles. Rep. 436, Sir John Nicholl states the general rule thus: " Wherever the patient once conceives something extravagant to exist, which has, still, no existence whatever but in his own heated imagination; and wherever, at the same time, having once so conceived, he is incapable of being, or, at least, of being permanently reasoned out of that conception, such a patient is said to be under a *delusion*. \* \* \* On the contrary, in the absence of any such delusion, with whatever extravagances a supposed lunatic may be justly chargeable, and how likesoever to a real madman he may either speak or act, on some, or on all subjects, still, in the absence of anything in the nature of delusion, so

understood as above, the supposed lunatic is not properly or essentially insane."

These extravagant notions, which amount to delusion or insanity, appear, by the cases cited by medical writers, to be either a wild and insane belief of the existence of some *palpable* fact, manifest to the senses not to exist, as that a particular individual is another person, or a horse, or a wild beast, or the like; or, that a state of *moral facts* exists, when it is clear, to a sound mind, that it exists only in the morbid imagination of the person laboring under it, as the belief that the person's best friend is his deadly enemy and is always seeking to destroy him. Ray on Insanity, §§ 104, 105. From the very nature of such delusions they must exert a controlling power over the mind and actions of the person, and wherever the subject of them is presented to his mind, their effect must be manifest and decided. One of these effects is excitement or emotion, either of fear, anger, or some other such manifestation as the nature of the delusion would likely produce. "They think and act under the influence of strongly excited feelings." Beck's Med. Jur. 564. This is illustrated in the case of *Dew* v. *Clark*; *Johnson* v. *Moore*, 1 Littell, 372; *Fulleck* v. *Allinson*, 3 Hagg. 527.

"There is no doubt that, in cases of monomania, all the mental faculties are more or less affected, but the affection is more strikingly manifested in some than in others." Taylor's Med. Jurisp. 626. If the delusion be not so great as to affect seriously the intellectual powers, or to dethrone the reason, as to the particular act in reference to which the question arises, it cannot be said to amount to insanity. "The intellectual disturbance," says Taylor, "may be sometimes difficult of detection; but in every case of true insanity it is more or less present; and it would be a dangerous rule to pronounce a man insane, when such evidence of its existence was not forthcoming. The law hesitates at present to recognize *moral insanity*, at least in civil cases; hence, however perverted the affections may be, a medical jurist must look for some indications of *intellectual* disturbance, *i.e.*, of disturbed reason." Taylor, 627. Upon the same principle, it is laid down, that no eccentricity or peculiarity of

character, no degree of moral depravity or of unnatural feeling, not amounting to destitution of reason, or mental incompetency to do the particular act, is to be considered as insanity.  Ib. 668. So a will may be manifestly unjust to the surviving relatives of a testator, and it may display some of the extraordinary opinions of the individual, yet it will not necessarily be void, unless the testamentary dispositions clearly indicate that they have been formed under a delusion.  Ib. 648.

A case of most extraordinary peculiarity of mind is that of *Morgan* v. *Boys*, in which the testator bequeathed all his property to a stranger, disinheriting his next of kin, and directed his executors to " cause some parts of his bowels to be converted into fiddle-strings—that others should be sublimed into smelling salts, and that the remainder of his body should be vitrified into lenses for optical purposes."  In a letter attached to the will, he stated that he had " a mortal aversion to funeral pomp, and that he wished his body to be converted into purposes useful to mankind."  He was shown to have managed his affairs with judgment and discretion, and he was considered by his acquaintances and intimate friends as a man of indisputable capacity.  The facts were considered by the court as showing merely a case of eccentricity, and not insanity ; and the will was held valid.  Taylor, 649.  The case of *Frere* v. *Peacock*, 1 Rob. 442, cited by Taylor, 648, was the will of a man laboring, in a high degree, under perverted moral feelings and affections ; but there was no positive evidence of intellectual unsoundness, and the court held that, though his conduct was strange and unnatural, there was no sufficient evidence of intellectual unsoundness, which was required to invalidate the will.  Dr. Beck states the general symptom of monomania to be that " the sufferers are pursued day and night by the same ideas and affections, and they give themselves up to these with profound ardor and devotion.  They often appear reasonable when conversing on subjects beyond the sphere of their delirium, until some external impression suddenly rouses the diseased brain."  1 Beck, Med. Jurisp. 555.  And this develops itself, according to the nature of the subject of derangement, by demonstrations of

anger, joy, grief, or such as the nature of the subject is calcula-
ted to produce. Ib.

With respect to the evidence requisite to establish insanity,
or delusion, that will avoid a will, the general rule is, that the
party is presumed to be of sound mind, and that it is incum-
bent on the party impeaching it, to establish the incapacity by
the clearest and most satisfactory proofs; and, if the instrument
purport on its face to be a legal act, the burthen of proof rests
upon the person attempting to invalidate it.    Williams on Ex-
ecutors, 19 (5 Amer. edit.).   This rule is more stringent, and the
proof more difficult, when the instrument is impeached on the
ground of partial insanity, the general soundness of mind of
the testator being apparent or conceded; in *Dew* v. *Clark*, Sir
J. Nicholl, says, in reference to the testator's daughter, who was
impeaching his will, on this ground : " She must be apprised,
however, as well, that the burthen of proof rests on her, as that
this burthen is, from the very nature of the case, a pretty heavy
one.   *   *   *    She must understand that no course of harsh
treatment—no sudden bursts of violence—no display of unkind
or even unnatural feeling, merely, can avail in proof of her al-
legation.   She can only prove it by making out a case of antipa-
thy, clearly resolvable into mental perversion, and plainly evinc-
ing that the deceased was insane as to her, notwithstanding his
general sanity."   Again, he says : " Had the daughter appeared
even more amiable than she does—had the deceased's whole
treatment of her been proved even more unnatural than it is—
*   *   still, in the absence of full proof that the whole of this,
on the part of the deceased, was founded in, and solely imputa-
ble to, morbid delusion or insanity, present to the mind of the
deceased, as well *generally*, as at the time of making this will,
on the subject of his daughter, and so on the subject-matter of
the will," it would not have been sufficient to invalidate it.

There is still more strictness and fulness of proof of the
alleged unsoundness of mind required where, in addition to the
general sanity of the deceased, and proof by the subscribing
witnesses of his capacity at the time of execution, and where the
dispositions of the instrument are reasonable on their face, the

will is in his handwriting.    In such a case, says Sir J. Nicholl, " the existence of insanity at that time (of execution) ought to be *clear beyond all doubt*, in order to affect it." *Fulleck* v. *Allinson*, 3 Haggard, 527.    " A monomania," says he, " to affect such an instrument, under such circumstances, should be clear in point of existence, and decided in character beyond all doubt." Ib.

We proceed now to consider the evidence touching the question of the testator's sanity, and mental capacity to make the will.

The main ground on which the hypothesis of his insanity is rested is, that he conceived and entertained the insane and deluded idea that his daughters were disobedient to him and took counsel of others, his enemies, in regard to their conduct, and acted accordingly; when that idea was utterly without foundation in truth.    The turning-point of the case, then, in opposition to the will, is, whether this idea was wholly without cause, and the mere figment of a deranged brain.    For if it was formed on apparent cause, and upon a view of the conduct of his daughters on his part, which we might think very erroneous and unjust, and even cruel and unnatural, it would show an *error of judgment*, but not an absolute want of intellect, upon the subject; and that view would be fatal to the hypothesis on which the will is impeached, to wit, an entire want of mental capacity to act on the subject.    It would show a case of an *erroneous conclusion* from the premises, a *judgment formed upon insufficient premises* to maintain it ; but not a *conclusion formed without any premises*, either actual or apparent, and acted on to a degree showing insanity.

The first point that arises, in considering the facts of the case, is, the acts and conduct of the parties towards each other, in relation to the alleged disobedience; and it is remarkable, in a case where the litigation has been carried on with so much labor on both sides, that there should have been so little evidence adduced as to what actually passed between the father and his daughters at and about the time of his expulsion of the daughters from his protection.

The *facts* touching the question of disobedience and unduti-ful conduct, as shown by the record, consist of his letter, writ-ten at the time, charging them with such conduct, and the tes-timony of the appellee given on this trial, denying the correct-ness of the charge.   No witness is introduced who ever saw them together about the time of the alleged misconduct, or heard anything that passed between them at or about that time.   At the starting-point of the investigation, therefore, we have, on the material question of misconduct in disregard of parental authority, only the allegation of the father, of the fact, accompanied by expulsion from his house, and the denial of the daughter; and from those statements, with the light of sur-rounding circumstances, and their previous and subsequent con-duct, we must determine whether the father acted in the mat-ter upon any apparent cause.

It appears that before the separation he was fond of his daughters, and treated them with kindness and affection; and, for ought that appears, that this feeling continued until they attended the night meetings in the fall of 1842.   It is shown by the evidence that for some time before that, he had enter-tained an antipathy to the Methodist Church, and he was after-wards in the habit of bitterly denouncing it to its members as well as to others; and he assigned as a reason for his aversion, that its members had purchased goods of him as a merchant, and run away and swindled him more than any other class in the community.   With a man of his strong will and bitter pre-judices, particular as he appears, by the evidence, to have been, as to the habits and deportment of his daughters whilst at school, and afterwards until the separation, it is not improbable that he communicated his feelings to them with respect to the Methodist Church; and he states in his letter expelling them from his house, that he did.   It would appear almost strange that a man in his situation, and of his feelings upon the subject of that church, and towards his daughters, should not have done so.

The appellee in her testimony states, that whilst at her father's house in 1842, she and her sister made it their study to please

him, to obey his commands, and carry out his wishes; that they went to church, and their father with them sometimes; that *he requested them not to attend night meetings except with him*, and they desisted; that afterwards, in the fall of 1842, they visited Mrs. Rowlett's with his consent, and, *while there, attended night meetings two nights successively;* and quickly after this they received his letter. Here is a clear admission that she acted contrary to his *request* in attending the night meetings without him. What she calls a *request*, he probably considered a positive *command;* and how that request or command was made, in what terms of rigor or otherwise, there is nothing positively to show, and we are left to infer how it was given, from his general stern and rigid character, from the harsh course he immediately pursued, and from the aversion he had to the Methodist Church. It appears that she attended the meetings with Mrs. Rowlett's family, and had, previously to his request not to attend such meetings, gone with another family in the town. After his letter to his daughters was received, Mrs. Rowlett wrote to him interceding for his daughters, and his reply plainly shows that he thought she had persuaded his daughters to attend the night meetings in violation of his wishes; and she must be the person referred to in his conversations, detailed by many witnesses, in which he stated that he had driven off his daughters for disobedience to him, and *for taking the advice of his enemies* in preference to his; for she states in her testimony that they never spoke to each other after that time.

Thus stands the question of disobedience upon the testimony of the father and daughter, the only direct testimony we have on the subject. But there are other circumstances that appear to be entitled to consideration.

No effort at restoration at the time is shown to have been made by the daughters personally; and he afterwards stated that they had not applied for pardon. They did not accept the proffer made in his letter to send their trunks and clothing to them, and to send them by conveyance to any place they desired to go to. The appellee said to Benj. Cottrell, when, immediately after the separation, he proposed to go and see her

father for the purpose of bringing about a reconciliation, that *if he knew as much as she did he would not go.* He knew of the letter; and she must, therefore, have referred to something that had taken place between her and her father before that, touching the subject which had produced his letter. It is shown that many of his acquaintances thought he had acted wrong in expelling his daughters from his house, and mentioned the matter to him with a view to reconciliation. He explained his course fully to them, in a calm and dispassionate manner; and in every instance they were satisfied that he acted right, or did not act without cause. He not only exhibited no signs of insanity, but convinced many intelligent witnesses that he acted right ; which is truly a most remarkable case, if he was really insane.

It is to be regretted that his statements to these witnesses are not in evidence, as they might explain a transaction over which there hangs a veil of mystery, and tend to palliate conduct on his part, which, whatever may have been the disobedience complained of, was in the last degree severe and unnatural, and wholly disproportioned to the alleged offence.

Viewing the matter of the expulsion, therefore, as it appears by the record, it is plain that the conduct of the deceased, at the time, was not absolutely without cause of complaint on his part, though it was cruel and unnatural. Consequently, it cannot be held to be without any foundation whatever in fact, and as the insane delusion of a monomaniac.

The next question for consideration is, the conduct of the testator, after the expulsion of his daughters, and up to the time of the execution of the will, in relation to them, and touching the matter of his sanity.

Many witnesses testify as to conversations held with him at various times, and under various circumstances; in nearly all of which he said, in relation to his daughter, the appellee, that she was married and provided for, and had no children ; that he would have given her property if she had had children. And to several he said, that his property should not go to the Cottrells. These declarations were made, for the most part,

Mullins et al. v. Cottrell.

without excitement and deliberately, in conversation with his intimate friends. They may show injustice to his daughter, but they also show any thing else than an insane mind; for they were founded on reasons that might well have had an influence over a person in his situation, and bearing the relations he did towards the appellee. He appears to have been very inimical to the Cottrells. One of them had married his daughter, without his consent, and had children by a former wife. He was a Methodist, and obnoxious to all the prejudices of the deceased on that ground. The testator very probably knew—as he was a very intelligent man—that any property he might give his daughter would, in case of her dying without children—and she had none, and would probably have none—go to her husband; and hence he may, with good reason, have said that he never intended that her husband and his family should have his property.

In the interviews between the testator and the appellee, as stated by the witnesses Swan and Dr. Smith, it appears that he treated her with politeness, but rather as a stranger. She was with him in private on one of those occasions, and the witness cannot state what transpired between them, except that the interview was for several hours, and when she came out she appeared to have been weeping. But no harshness or severity, or excitement, was manifested by him on these occasions.

The only witnesses who speak of his exhibiting any excitement when speaking of his daughter, are Mrs. Hardy and Dr. Scruggs. As to the former witness, she visited him whilst sick and low, in which condition he had been for some time; and, on her proposing that he should see his daughter, he said, she would poison him, and only wanted his property, and became much excited, his face pale and muscles swollen. It is not improbable that he was annoyed at the interference of this witness, and in his low state of health; and was excited on the occasion. She admits that she did not like him, and it is not improbable that she reciprocated the feeling. Dr. Scruggs states that he exhibited too much rigidity of the nerves of the face and too much twitching of the face, when speaking of his

daughter; and that he regarded him as a monomanic.   But he was not intimate with him, never visited him, and conversed with him and heard him converse with others on public occasions.   He differed with the deceased both on religion and politics, and heard him denounce the Methodist Church, of which Dr. S. was a preacher, very bitterly.   Under such circumstances, the statements of this witness are clearly not entitled to prevail over the great number of witnesses who state that the deceased was not excited when speaking of his daughters, but spoke calmly and dispassionately.   These witnesses were his intimate friends and neighbors, who had known him long, and his family physician.

It is clear that in nearly all the instances in which he spoke of his daughter, he was calm and not excited.  If he was excited as stated by the witnesses Mrs. Hardy and Dr. Scruggs, it was exceptional, and not his general habit, as is proved by the numerous other witnesses.   His excitement, under such circumstances, when speaking of his daughter, would not indicate insanity; for, as is above shown, excitement is always manifested, in cases of monomania, when the subject of it is presented to the mind; and the very fact that the mentioning of it does not, generally or always, produce that effect, is evidence that the party is not laboring under the supposed delusion.

Several other circumstances are relied on as showing that his mind was not sound—his eccentricities, his statements about his hearing the reports of guns at Fort Sumpter and Pensacola—about preparing to keep out witches—his statements about pursuing the horse-thief—and his hanging of the negro.   These matters are urged as corroborative of the main fact, alleged to exist, of insanity with reference to his daughter.   It is not contended that they are sufficient of themselves to establish mental delusion which will avoid the will; and as the evidence does not establish the main fact, as we have above shown, the testimony introduced to corroborate it, is not sufficient to show insanity.

But the statements as to reports of guns, and as to witches, were in all probability made in jest; for it is shown that

he was an intelligent man, of great firmness and decision of character, but fond of jesting and quizzing. His statements about pursuing the horse-thief are probably true, and it is very clear that his conduct in hanging the negro is far from indicating an unsound mind. However the cruelty and inhumanity of the act may be condemned, it is clear that it was done as an act of deliberate judgment with a view to produce effect in deterring negroes from running away and going to the enemy, which was then considered a great evil. His conduct in the affair, though highly reprehensible, was characterized by that decision and strong will which marked nearly all his actions.

It has been strenuously insisted, by counsel for the appellee, that this case bears a strong similitude to that of *Dew* v. *Clark.* But, in its essential features, it is wholly different from that case. The delusion in that case, which consisted in an insane hatred, without the shadow of a cause, of his infant daughter, began at the early age of about four years and continued throughout his life, manifested by the most cruel and inhuman punishment; stripping her naked and unmercifully flogging her, and then rubbing her back with brine. He compelled her to do the most degrading work; denied her decent clothes; denounced her from an early age as an abandoned profligate and a devil; burst into a rage whenever she was in his presence; compelled her to write a daily account of her thoughts, and punished her severely for not acknowledging offences which she had never committed. His thoughts were absorbed by her continually, and he was in the habit of denouncing her to others constantly. He complained to others of her dreadful character, and such were his outrages to her, that she could not be left in the house with him. She was a person of great amiability. In addition to his conduct towards her, he gave decided evidence of mental derangement in other respects, though of sound mind on most subjects. His will, which left his daughter but a pittance of his estate, was held void, by reason of his delusion and insane hatred to her. This was on the express ground that there was no pretence imaginable for his hatred and ill-treatment of her, and that it could only be ascribed to delusion.

The case of *Fulleck* v. *Allinson* bears more resemblance to this case, and the principle there settled is that which is applicable here. The testator was always an eccentric man. In consequence of being taken very ill, and two of his servants at the same time, he believed an attempt had been made to poison him. On the advice of his solicitor and physician, an investigation was made, and the persons who made it were satisfied there was no ground for his suspicion. But he remained in the belief that the food sent him by his nephew-in-law was poisoned, and this continued to his death. The will was all in his handwriting, and was regularly attested by witnesses, who, though aware of his opinion about the poisoning, swore to their belief of his sanity. His property was not left to his relatives in his will, and they contested it. In deciding that the testator was not insane, the court held the rule above stated, in regard to the nature of the proof necessary to invalidate a will made under such circumstances; and further stated: " That the deceased thought and believed that an attempt had been made to poison him, seemed to be a fact established; but was it proved that his opinion, in that respect, was a mere morbid, insane delusion, rendering him intestable? The question is not whether the attempt to poison was really made, but whether he had grounds for suspecting it."

Here the deceased wrote the will with his own hand; its dispositions, on its face are reasonable, in furtherance of the object he had in view, to give his property to his niece and her children; and sensible provisions to that end are contained in it, and nothing in the least degree indicating want of judgment, much less unsoundness of mind. The attestations were obtained by his personal solicitations and calling on two sets of witnesses; his explanations of his reasons for not leaving his property to his daughters made at the time, on inquiry by one of the attesting witnesses, were made calmly and without excitement, and in themselves are rational. In addition to this, a large majority of the witnesses, and those most intimately acquainted with him, testify fully to his mental capacity and explain his feelings towards his daughter as stated by himself. And there is the ab-

sence of that excitement and agitation, amounting in most cases to fury, which generally attends and characterizes the conduct of the party laboring under insane delusion, when the object of it is presented to his mind, and especially when in his presence.

Applying to the peculiar circumstances of this case, the rules of law above stated in regard to the proof necessary to establish the insanity, and that the act in question was the direct and immediate offspring of it, we are of opinion that the verdict, in this case, is clearly against the weight of evidence and is not sustained by the principles of law applicable to the facts; and reluctant as we are to set aside the verdicts of juries as against evidence, and strong as the presumption must be in their favor, we consider it our duty to set them aside and to award new trials, when they are manifestly against either the law or the evidence; and we consider the verdict in this case as obnoxious to objection on both these grounds.

The second error assigned is, the admission of declarations and opinions of the testator on religious subjects.

Upon a question of sanity, the conversations of the party whose act is involved, upon any subject tending to show his state of mind, may be given in evidence. 1 Jarman on Wills, 79–80. Though a man's sanity is generally not determined by his religious creed, yet his opinions may be so absurd as to afford evidence of unsoundness of mind, and they are proper to be considered, with other evidence, under proper instructions by the court, as to the effect that they are entitled to. But a merely erroneous religious creed, or an aversion to any particular sect, is not evidence of insanity.

The third error assigned is, the admission of evidence as to the character of the appellee after she was expelled from her father's house.

There was no error in this. The question was, whether the alleged insanity which caused the testator to expel his daughters from his house did not continue until the time of the execution of his will; and whether the want of reasonable ground for it did not also continue. Her continued good character was proper to be considered in determining whether there was not

want of reasonable ground for his ill-feeling at the time the will was made.

The fourth error is not well assigned.   It was proper to admit all the conversation which passed between the testator and the witness Coleman; for it might be necessary, in order to understand the replies of the testator, to know what were the remarks to which they were answers.   And if any opinions of the witness, thus expressed, were incompetent, the appellants should have moved to exclude them, or that the jury should give no weight to them.

The fifth error assigned is, that the court refused to permit a witness, introduced by the appellants, to testify in relation to certain witnesses, who it was expected would be introduced on the part of the contestant, hunting up testimony for her and taking an active part in her behalf.

This ruling was correct.   The witnesses alluded to on the part of the contestant had not been introduced, and it would certainly have been improper to allow their credit to be impeached—and that was the object of the proposed testimony—before they had been introduced and examined.   Even if these witnesses had been introduced and examined, it would have been necessary, in order to impeach their credit, to interrogate them in relation to the supposed bias and the acts done by them showing their interest or zeal in behalf of the contestant, and thus lay the foundation for the admission of other testimony showing their bias or zeal, and contradicting their statements. *Edwards* v. *Sullivan*, 8 Iredell, 302; *Newcomb* v. *The State*, 37 Miss. 383; 2 Phill. Evid. 904–905, and cases cited (4 Amer. edit.).

The sixth error assigned is, that the jury was illegal, as appearing by the affidavit of a person, exhibited with the motion for a new trial, to the effect that the witness was of the *impression* that he had, before the trial, heard the juror advocate the claim of the contestant, and express the opinion that the will should be set aside.

Under any circumstances, it requires the clearest proof of misconduct on the part of the jury, or of some member of it, to

justify the setting aside of their verdict.   Here the evidence was not clear and positive, but merely the statement of the affiant's *impression* as to the improper conduct.   That was insufficient.   But, moreover, there was no evidence that the appellants were not apprised of the facts stated, and were not willing to accept the juror notwithstanding.   As all the presumptions are in favor of the regularity of the verdict, there must be clear and full evidence to show the disqualification, and the appellants' want of knowledge of it, to vitiate the verdict.   There was therefore no error on this ground.

The last error assigned is, that the instructions given at the instance of the contestant were erroneous.

We have carefully considered these instructions, and they appear to be free from objection, except the sixth, which is in these words :

" If the jury believe from the evidence, that the contestant was always an obedient, dutiful, and good child, but that, under the influence of an insane delusion, her father concluded and believed that she had become disobedient and utterly unworthy of his regard, and utterly cast her off as a child, and that the paper in controversy was the direct offspring of such insane delusion, they should find " against the will.

This instruction, in its terms, is correct, as a legal proposition.   As a technical, legal rule, to be applied and acted on by minds versed in legal terms, it would be unobjectionable.   But as a rule to be practically applied by a jury unskilled in the force of technical terms, it appears to be objectionable in this, that it leaves the jury to determine—without particular direction as to what degree of *delusion* should appear in the case—the question of what was necessary to constitute insane delusion, such as would invalidate the act.   The popular idea of what is *delusion*, is very different from the true, legal force of the term. We have above seen, that, if the testator acted under an insane delusion, *without any cause, real or apparent*, in regard to the alleged disobedience, the will would be invalid ; but that if he acted upon a cause which was either real or *apparent*, that might show error of judgment, but not insanity.

We, therefore, think that the instruction should have been modified by adding, after the words "insane delusion" in the first part of it, the words "*and without any cause real or apparent.*"

It follows from these views, that the decree must be reversed, the verdict set aside, and the cause remanded and a new trial awarded.