WESLEY M. OWEN, Exr.

*v.*

CHARLES A. CRUMBAUGH *et al.*

*Opinion filed June 19, 1907—Rehearing denied October 9, 1907.*

1. WILLS—*a belief resting upon evidence is not an insane delusion.* A belief in the existence or non-existence of certain facts or phenomena which results from a process of reasoning, based upon some sort of evidence, is not an insane delusion, even though the process of reasoning is imperfect and the conclusion is illogical.

2. SAME—*what is essential to constitute an insane delusion.* An insane delusion must be such an aberration as indicates an unsound or deranged condition of the mind regarding a fallacy that can be demonstrated as distinguished from a mere belief in the existence or non-existence of supposed facts or phenomena based upon some sort of evidence.

3. SAME—*a belief in the doctrines of spiritualism is not insanity.* An absolute belief in the doctrines of spiritualism, even though it influences the testator to leave a large portion of his property for the establishment of a spiritualist church, is not evidence of insanity such as justifies setting aside the will, in the face of evidence showing that the testator in his business relations was capable and rational, and acted with the judgment, prudence and foresight possessed by successful business men.

4. SAME—*attributing escapes from death to spirit guidance is not an insane delusion.* The fact that a man who has narrowly escaped accidental death on several occasions attributes his escape to the guidance of a guardian spirit, instead of to intuition, good luck or the act of God, is not evidence of an insane delusion.

5. SAME—*when testimony of expert that testator was insane is of little value.* Where the preponderance of the evidence shows that a testator, at the time of making his will, was in full possession and proper exercise of all his mental faculties, an opinion of a medical expert, based upon a hypothetical state of facts not inconsistent with legal sanity, that the testator was insane is of little weight, and does not, of itself, justify the court in refusing to direct a verdict in favor of the proponents.

6. SAME—*facts stated in contestant's hypothetical question must be incompatible with sanity.* A verdict of sanity should be directed by the court notwithstanding the testimony of medical experts that the testator was insane on the subject of spiritualism when he made his will, if such testimony is given in answer to a hypothetical ques-

tion which enumerates, as the grounds of the expert opinion, a series of acts, peculiarities and mental states which, taken together, amount to no more than that the testator was a spiritualist and believed fully in the doctrines and practices of that faith, where there is other evidence showing mental competency at the time the will was made.

7. SAME—*what evidence does not show insane delusion.* Proof that the testator had become a spiritualist in the last few years of his life; that he believed he was attended by a guardian spirit; that he carried a picture of a man which he believed to be a "spirit picture" of his child who had died in infancy thirty years before and had grown to manhood in the spirit·land under the name of "Bright Eyes;" that he traveled great distances to attend seances; that he sometimes cried when speaking of the dead and when friends refused to attend seances at his request, and that he embraced all the doctrines of spiritualism without question, does not establish an insane delusion.

8. APPEALS AND ERRORS—*one cannot take advantage, on appeal, of absence of proof he has prevented being made.* One who prevents the opposite party from making certain proof by objecting to the evidence offered, cannot take advantage, upon appeal, of the absence of such proof from the record.

APPEAL from the Circuit Court of McLean county; the Hon. C. D. MYERS, Judge, presiding.

FIFER & FIFER, WELTY, STERLING & WHITMORE, and BARRY & MORRISSEY, for appellant:

A belief in the doctrines of a church cannot be held to be a delusion which will invalidate a will. A delusion common to all the members of a religious sect will not avoid a will. *Newton* v. *Carberry,* 5 Cranch, 626.

The fact that a person is affected with insanity, or labors under some delusion, believes in witchcraft, clairvoyance, spiritual influences, presentiment of the occurrences of future events, dreams, mind reading, etc., will not affect the validity of his will on the ground of insanity. Manifestly, a man's belief can never be made a test of sanity. When we leave the domain of knowledge and enter upon the field of belief the range is limitless, extending from the highest degree of rationality to the wildest dream of superstition,

and no standard of mental soundness can be based on one belief rather than another. *Whipple* v. *Eddy*, 161 Ill. 114.

A belief in spiritualism is not proof of insanity. *Orchardson* v. *Oldfield*, 171 Ill. 14.

It cannot be said that because a person believes in spiritualism he is of unsound mind or subject to an insane delusion. *Middleditch* v. *Williams*, 45 N. J. Eq. 726.

The court cannot say, as a matter of law, that a person is insane because he holds the belief that he can communicate with spirits and can be and is advised and directed by them in his business transactions and in the disposal of his property. *Brown* v. *Ward*, 53 Md. 376; *In re Keeler's will*, 3 N. Y. Sup. 629.

A belief in Swedenborgianism is no evidence of insane delusion or insanity, (*Scott* v. *Scott*, 212 Ill. 597,) nor is a belief in the faith cure. *Frich's will*, 165 Pa. St. 586.

Where the testator left his property to the American Bible Society, disinheriting his children, and it was shown that he believed in spiritualism, clairvoyance, dreams, etc., his will was sustained. *Chafin will case*, 32 Wis. 557.

STONE & OGLEVEE, DEMANGE & HOBLIT, BEACH, HODNETT & TRAPP, E. D. RIDDLE, and J. F. BISHOP, for appellees:

Where a fiduciary relation exists between the testator and a devisee who receives a substantial benefit from the will, and where the testator is the dependent and the devisee the dominant party, and the testator therefore reposes trust and confidence in the devisee, as in the ordinary relation of attorney and client, and where the will is written or its preparation procured by that beneficiary, proof of these facts establishes *prima facie* the charge that the execution of the will was the result of undue influence exercised by that beneficiary, and this proof, standing alone and undisputed by other proof, entitles contestants to a verdict. *Weston* v. *Teufel*, 213 Ill. 299.

If the testator was laboring under an insane delusion that spirits of the dead were directing him in all his business and to make the will as he in fact did make it, this was undue influence as universally defined. *Middleditch* v. *Williams*, 45 N. J. Eq. 726; *Robinson* v. *Adams*, 62 Me. 407.

Law, it is said, is "of the earth earthy," and that spirit wills are too celestial for cognizance by earthly tribunals,— a proposition readily conceded. And yet the courts have not assumed to deny to spirits of the departed the privilege of holding communion with those of their friends who are still in the flesh, so long as they do not interfere with vested rights or by the means of undue influence seek to prejudice the interests of persons still within the jurisdiction of the courts. *McLory* v. *Stull*, 44 Neb. 175.

In the *Orchardson case* this court set aside the marriage of Minerva Merrick because it was the result of supposed direction from spirit of her former husband. *Orchardson* v. *Cofield*, 171 Ill. 29.

On a motion to take an issue from the jury, the question is, is there any evidence tending to support the issue?—and not, whether the verdict would have to be set aside as against the manifest weight of the evidence. *Woodman* v. *Bank*, 211 Ill. 578.

Is there any evidence in this record which, with all reasonable inferences and intendments to be drawn therefrom, fairly tends to prove that the testator was not, at the time of the execution of the will in question, of sound mind and memory, and is there any such testimony fairly tending to prove that he was at that time unduly influenced to execute that will? These are the material and only questions presented for our consideration and decision upon this appeal. *Woodman* v. *Bank*, 211 Ill. 581.

Rules as to directing verdicts in suits at law apply in will contests. *Woodman* v. *Bank*, 211 Ill. 578.

When a declaration contains counts which are sufficient to sustain the judgment and to which the evidence is ap-

plicable, the refusal of the court to instruct the jury to disregard other counts is not reversible error. *Swift & Co.* v. *Rutkowski,* 182 Ill. 18.

Insanity may exist as to one subject while as to all others the testator may be perfectly sane. *American Bible Society* v. *Price,* 115 Ill. 643.

Mr. Justice Vickers delivered the opinion of the court:

This is a bill in chancery brought by certain nephews and nieces of James T. Crumbaugh to set aside his will on the grounds of undue influence and want of testamentary capacity. Wesley M. Owen, as executor, and others, were made defendants. An issue at law was tried by a jury, resulting in a verdict finding that the instrument in question was not the will of the testator. At the close of all the evidence a motion was made, accompanied by an instruction to that effect, to direct a verdict for proponents. This motion was overruled and the instruction refused. From a decree setting aside the will and the probate thereof the executor appeals to this court.

The testator was born January 28, 1832, and died April 3, 1905, leaving his widow, Elizabeth J. Crumbaugh, surviving him. He left no children or descendants of children. One brother and three sisters and certain nephews and nieces were his only surviving heirs-at-law. His widow died since the commencement of this suit. The testator resided on a farm in McLean county, Illinois, practically all of his life, until the year 1883, when he moved to the city of Leroy, in said county, where he resided until his death. He was the owner of thirteen hundred acres of valuable farm land in McLean county, a number of town lots in the city of Leroy and a considerable amount of personal property. His entire estate is estimated at about $250,000. After moving to Leroy the testator engaged in the banking business with his brother. After his brother's death the private bank was re-organized as a national bank, and testator be-

came the vice-president and a member of the loaning com-·mittee, and performed the duties of those offices until his death. About thirty years prior to the death of the testator his only child, a boy, was born, who lived but six weeks. By the will the testator devised $1000 to his brother, Daniel T. Crumbaugh, and $1000 each to Caroline Rogers, Martha Bartlett and Nancy Hamilton, sisters of the testator. In addition to these legacies about $2000 was distributed in small amounts among certain of his other more distant relatives. Some of his remote relatives were not given anything. As bearing upon the omission of the testator to make provision for all of his relatives the following excerpt from the will is pertinent:

"(5th.) *Fifth*—Again I mention that I have herein made bequests to only a portion of my relation, and be it understood that I have not forgotten the name or relationship of any, but that I have given every one of such relation as I care to do and whom I feel I should, and those whom I have not mentioned I most emphatically feel are not entitled to anything from my estate. As they are not named by me I do will that they receive nothing."

To his wife the testator devised the rents, income and profits of all of his property, of every kind and character, for her natural life, not otherwise specifically devised, and in addition she was given about two hundred acres of farm land in fee, and he made her the residuary legatee of all his undisposed of property, of every kind and character. By the eighth clause of the testator's will he disposes of the greater portion of his estate, as follows:

"(8th.) *Eighth*—Be it now understood that the property now possessed by my wife and I, was made, secured and accumulated by the application of hard labor and economy, and I know that the public is aware that my relatives aided me but very little and that I have been necessitated to help them far more than they have assisted me, so in the light of my desire, and with the warm approval of my be-

228—25

loved wife, I now give, will and bequeath to Wesley M. Owen, of Leroy, Illinois, to A. L. Coffey, of Leroy, Illinois, to Clay West, of Leroy, Illinois, to F. L. Horine, of Monarch, Illinois, and to James Loar Bonnett, of Bloomington, Illinois, 'in trust' as trustees, and their successors in office, to be named as hereinafter provided, and to be held in trust forever and forever and under the following conditions and restrictions, subject, however, to the life estate of my wife, as hereinafter provided, my home and prairie farm in West township, also the Thomas L. Wiley farm, now held by me under contract of purchase and which I shall receive by deed on March 1, 1902, and all of which land is more particularly described as follows, to-wit: Section eighteen (18) and the south half of section seven (7), town 22, north, range 5, east, in West township, also the east half of the east half of section thirteen (13), township twenty-two (22), north, range four (4), east, in Empire township, all in McLean county, Illinois, which includes about eleven hundred (1100) acres, to the same more or less. Now be it understood that I do give, will and bequeath the same to such above named five people, and their successor in office, 'in trust' as 'trustees,' and to be so 'held in trust' by them forever and forever, under the following conditions and restrictions and for the purposes hereinafter named and mentioned: That is, I first will and direct that my wife shall have all the rents and profits of the above mentioned real estate during the time of her natural life, the same to be collected and paid her by my executor, but at her death, or in the event of her death before mine, then it is my will and the desire of my wife that such above mentioned real estate of eleven hundred acres (1100) shall go to and be held by said trustees and their successors 'in trust' for the purposes herein named; that is, as soon as there shall accumulate in their hands sufficient money, I direct that there be built on lots 1, 2, 3, 4, 5 and 6, of block 135, Wood & Conkling's addition to Leroy, Illinois, being the vacant property just

east of my residence and which I purchased from the Collins heirs, a spiritualist church and a public library for the use of the public, without any restrictions, and in which any individual, of either sex or color, may worship or enjoy the library; said spiritualist church shall be of modern design, so built that it shall face with its main entrance to the west, and shall have in addition to the church auditorium a Sunday school room; that said trustees shall secure, from time to time, some spiritualist minister or lecturer, and which minister or lecturer shall be under the charge and direction of said trustees, but it is my desire that said trustees endeavor to have regular spiritual services in such church, and that such minister or lecturer be one who shall exert every means to promote the gospel and who is in sympathy with the spiritualist organization; that such church shall be known as the 'J. T. and E. J. Crumbaugh Spiritualist Church,' and should the time ever come when there should be no spiritualists in Leroy or vicinity, then such church and Sunday school room shall be used for such church purposes as said trustees or their successors may desire and decide, but in no event and under no circumstances shall such church building be used for any other purpose than a meeting house for the spiritualists, whenever there shall be any to attend or those who desire such meeting. It is my further will, and I do so direct, that there be constructed after but in addition to such spiritualist church, and on a site just east of such church, and in which there shall be erected a tablet or memorial bearing a suitable testimony to my dear beloved wife and I, a free and public library; that such building shall be built of modern design and to and in connection with such church, but shall be just east of the church and shall face or front to the north; that is, the church entrance shall be to the west or on Pearl street, while the library entrance shall be to the north and on Center street. ' The said library building, when completed, shall be equipped and furnished with such books, literary works, papers and letters as will

best promote and advance good society and make men better, morally and intellectually; that such public library shall be known as the 'J. T. and E. J. Crumbaugh Public Library,' and shall be under the entire control and management of said above named trustees and their successors in office; that said trustees shall compile and publish such rules as will be necessary, from time to time, in the use and care of the books, etc., and shall at all times and under every circumstance make it easy and pleasant for the poor children of Leroy to see and use such library. Now, to the end that such spiritualist church, to be known as the 'J. T. and E. J. Crumbaugh Spiritualist Church,' be built and endowed, and to the end that such·public library, to be known as the 'J. T. and E. J. Crumbaugh Public Library,' be built and endowed, I do so will, give and bequeath to said above named trustees, and their successors in office, all the land and real estate (1100 a.) mentioned as being situated in section 7 and 18 of town 22, north, range 5, east, and section 13, town 22, north, range 4, east, McLean county, Illinois, to be held by them in trust forever and forever, (subject to the life estate of my wife,) for said purposes above mentioned. Now, be it further understood, that at no time and under no circumstances can such trustees, their successors or any one, sell, convey or mortgage any part or portion of such above described tract of eleven hundred acres, but that the same shall be held by said trustees and their successors in office 'in trust' for the purpose of building said church and public library. It is my further desire, and I do so will, give and bequeath for the purpose of selecting and naming the site of such J. T. and E. J. Crumbaugh Spiritualist Church and the J. T. and E. J. Crumbaugh Public Library, lots 1, 2, 3, 4, 5 and 6, block 135, Wood & Conkling's addition to Leroy, Illinois, to the said Wesley M. Owen, A. L. Coffey, Clay West, F. L. Horine and James Loar Bonnett, trustees, and their successors in office, as hereinafter named, to be held in trust forever and forever and on which to build

said church and library.  It is further my will and desire
that the said trustees and their successors use all honorable
means in renting and keeping in repair all said real estate,
taking charge of the same at the death of my wife, or in
the event of her death before mine, then at my death, and
whenever there shall accumulate in their hands sufficient
sums, they shall erect a church building first, and provide
the same with a minister or lecturer, and subsequently, and
so soon as accumulations will warrant, erect and furnish
said library:  *Provided,* that should I during my life, or
after my death my wife, erect said church building on said
lots, then and in that event there shall be added and con-
structed such additions as will be necessary to meet the terms
and provisions of this my last will and testament.  It is here
further provided that said trustees shall formulate, compile
and publish on the first day of June each and every year
after taking charge of such property, a full and complete
report, showing the aggregate amounts of rents received,
from whom, and the expenses incurred in renting, taxes, in-
surance, etc., and all receipts and disbursements of said J. T.
and E. J. Crumbaugh Spiritualist Church and J. T. and
E. J. Crumbaugh Public Library, which report shall be pub-
lished in a Leroy paper, a copy filed with the city clerk of
said city of Leroy, Illinois; that the books and records of
such church and library shall be at all times open to public
inspection, and no trustee shall prevent anyone from making
all reasonable investigation as to the disposition made of
any moneys.  Said trustees shall have the right to make all
rules and regulations necessary for the use and control of
the church and library:  *Provided,* the rules of such church
shall conform and be in sympathy with the rules and regu-
lations of the national organization of spiritualists, and no
rule for church or library shall defeat the end that all who
desire and have honest intentions may enjoy the virtue of
worship or the pleasure of library work.  It is my further
will that when such spiritualist church shall have been

erected, with Sunday school room, and said public library shall have been erected and equipped, then such rents shall be applied to the care of farm, the enlargement of church or the enlargement of library, but in no way shall it be used to defeat the desire that said rents endow and forever maintain said church and library. It is further provided that said Wesley M. Owen, A. L. Coffey, Clay West, F. L. Horine and James Loar Bonnett, trustees, and their successors in office, shall hold office during their residency in McLean county and good and honest conduct, and for life, but in the event of their death, removal from county or resignation, then in that event such vacancy or vacancies shall be filled by the pastor of such J. T. and E. J. Crumbaugh Spiritualist Church, the superintendent of Sunday school of the J. T. and E. J. Crumbaugh Church and the mayor of the city of Leroy, Illinois, being in all three (3) votes, any two of which shall be sufficient to name such trustees, who shall then be duly declared elected and shall have the same authority as if named by me: *Provided,* that in the event a vacancy or vacancies occur in said trusteeship at a time when there shall be no pastor or superintendent of Sunday school, then and in that event said remaining trustees shall appoint from their body some one to represent such pastor or superintendent, or both, and such person or persons so selected, together with said mayor of the city of Leroy, Illinois, shall by a majority vote of such committee fill said vacancy. Be it understood that to no further extent than filling said vacancy or vacancies in said trusteeship shall said mayor of Leroy, Illinois, or the pastor or superintendent of said church, have anything to say or do in the construction, management or control of said church or library, said management and control of said church and library, as well as the renting and care of such real estate, to be exclusively in the charge of said trustees heretofore named and their successors in office. It is further provided that said trustees and their successors shall serve in such capacity without

compensation for their services but shall be allowed actual expenses incurred, and which expense shall be published in full in the report made on the first day of June of each and every year."

The twelfth clause of the will is explanatory of the above, and is as follows:

"(12th.) *Twelfth*—Now, be it understood that I do hope it will never be questioned but that I have been in my right mind and natural mind in the making of this my last will and testament, and I have not been influenced by any person or spirits, but have only made same after many weeks of study, thought and consideration. As before expressed, I have talked and conversed freely with my dear wife, and she heartily approves and with me desires such a bequest as I have made for the purpose of establishing and endowing the aforesaid J. T. and E. J. Crumbaugh Spiritualist Church and J. T. and E. J. Crumbaugh Public Library in Leroy, Illinois, our own city and home, and the city which we both love so dearly and whose future interests we have so at heart. Our property has all been made by us in our efforts to save and apply, and the closing joy of my life is the ability of my wife and I to leave something of a permanent nature that will always be a monument in Leroy to the memory of my dear wife and I, and which we further hope will aid many to seek and find the light of the gospel and the beautiful truths uttered by the Great Letters of the past."

The specific grounds upon which contestants sought to set aside the will, as charged in their bill, are as follows:

"That the said James T. Crumbaugh, at the time of executing the said instrument in writing purporting to be his last will and testament, was of advanced age, past seventy years, afflicted with disease and was not of sound mind and memory, but, on the contrary, was at the time wholly incapable of understanding the nature and effect of the business in which he was engaged; that at the time of the making of said will the said James T. Crumbaugh was possessed

of an insane delusion as to the natural objects of his bounty and the object upon which he attempted by the said alleged will to confer his bounty; that he was insane upon certain religious subjects, and that this insanity, delusion and unsoundness of mind directly affected and controlled the distribution of his property and rendered him wholly incapable of making any just and proper division and distribution of his estate, and that such insanity, delusion and unsoundness of mind continued until the time of his death; that owing to his impaired mind, and also to his highly excited feelings in matters pertaining to spiritualism, the said James T. Crumbaugh was very liable to be unduly influenced by others, and that his mind had been purposely directed and unduly influenced by designing persons, to-wit, Wesley M. Owen, Mrs. Isaac Pemberton, Mrs. Coolidge, Bang sisters, Mrs. Elizabeth J. Crumbaugh, and various other persons and spirits whose names are unknown, to make such a disposition of his property as he actually did in said instrument of writing, so that, although his mind had become so impaired as to incapacitate him to make a will, this idea of making these bequests to build and maintain a spiritualist church and library and leaving his nearest kin unprovided for, remained fixed in his mind, and that the said James T. Crumbaugh was at the time of the execution of said instrument of writing under improper restraint and undue influence from the undue acts and fraudulent practices of these designing persons, and that said undue acts and fraudulent practices consisted in obtaining control of the mind of said James T. Crumbaugh by means of hypnotism, mesmerism, legerdemain, seances, and by working upon the already disordered mind of the said James T. Crumbaugh by means of communications from the supposed spirits, and thus directing the said disordered mind, over which, by these fraudulent means, they had obtained control, in such a way as to cause him to believe that his future welfare and happiness in the world to come depended upon his disposing of

his property as he by the said supposed will did attempt to dispose of it, and by causing him to believe that the spirits of his departed friends and relatives ordered him to so dispose of his property, and particularly that 'Bright Eyes,' the spirit of his dead son, advised and requested such a disposition of his said property, and that this control over his mind was secured by pretenses of friendship toward the said James T. Crumbaugh and by obtaining his confidence, to the end that by and through the means aforesaid this property could be secured for the benefit of the spiritualist church in general and for the benefit of these same designing persons who expected to profit therefrom."

The issues formed by appellant's denial, in his answer, of all that is material of the foregoing allegations were the questions submitted to and decided by the jury. So far as the issue of undue influence is concerned, considered separately from the alleged delusions of the testator in regard to spiritualism, but little need be said. While the contention of contestants on this issue is not abandoned, still the evidence introduced in support of such contention is so meager that it cannot be seriously contended that contestants' position on this point is supported to such extent as to require any extended notice by this court. It is apparent from the method of treatment in the respective briefs of the parties that the controversy in regard to Crumbaugh's testamentary capacity is regarded by both parties as the paramount and controlling issue in this case.

Upon behalf of contestants some twenty-four lay witnesses and eight physicians were introduced and testified before the jury in support of the allegations of the bill. No attempt will be made to set out the evidence of these several witnesses in detail. No necessity exists for so doing, and it would unduly extend this opinion if such course were pursued. The non-expert witnesses testify, generally, to a personal acquaintance with the testator varying from a few months to several years, and most of them also say that

they had conversed with the testator on the subject of spiritualism, and many undertake to re-produce the substance of such conversations, and quite a number of the witnesses for contestants express the opinion that the testator was insane on the subject of spiritualism. From the body of the testimony of the non-expert witnesses a number of facts or occurrences are brought out upon which the witnesses base their opinions of insanity, and which form the basis of contestants' most serious contention that the testator did not possess the sound mind and memory requisite to make a valid will. The facts testified to by the witnesses for the contestants may be summarized as follows:

The testator had been a Universalist in his religious belief until five or six years before his death. His wife had been a spiritualist for many years. Prior to the time he embraced spiritualism he was an ardent Universalist and very much opposed to the views of spiritualism held by his wife. His views underwent a complete change a few years before his death and he became a pronounced and enthusiastic spiritualist. He visited distant parts of the country to attend spiritual seances. He made one or more visits to Lillydale, N. Y., to attend a spiritualist seance and went to other distant points for the same purpose. On one occasion, when he returned from Lillydale, he brought a picture with him which he said was the picture of his boy that had died some thirty years before, and also a flower from the spirit land which he claimed had been given him by his son. The picture represented a full grown young man, which the testator said was the picture of his son who had grown to manhood in the spirit land and that his name in the spirit land was "Bright Eyes." The testator said to one witness that Bright Eyes was his spirit guide and that he attended him and kept him from harm. The testator also had pictures, which he had procured at these seances, of persons who had died long before, and which pictures he claimed had been taken from the appearance of the persons at the spiritualist seances.

The testator also had a picture, made in the same way, of himself in a group with certain deceased persons. It is also shown that the testator told some of the witnesses that Bright Eyes would come to his room at night and bid him good night; that his mother appeared to him and implanted a kiss on his cheek many years after she had died. It was also shown that the testator would frequently urge the witnesses to attend spiritual meetings, assuring them that they could hold communications with their deceased relatives. It is testified to, also, that on one occasion when the testator was in a field where the witness was blowing out stumps with dynamite, a piece of one of the stumps was blown in such a way that it would have struck the deceased if he had not moved just prior to the explosion; that on another occasion the testator fell and his head came near striking a step, and that on another occasion, when the testator was burning brush, his feet became entangled in the brush and he fell and came near falling into the fire. In relating these several occurrences the testator would ascribe his deliverance from the impending danger to Bright Eyes, and told his neighbors and friends that it was Bright Eyes who saved him on these occasions from being injured. On another occasion the testator visited one of his relatives for the purpose of obtaining her signature to some papers which he desired to have executed in furtherance of an adjustment of some pending litigation between certain relatives. There was a state of ill-feeling between the witness visited, Mrs. Sarver, and her mother, and she testified that she refused to sign the papers. At this time the testator urged Mrs. Sarver to forgive her mother and become reconciled to her, and said that he had forgiven her mother for the murder of his child. He said that Mrs. Sarver's mother and her husband, who was a brother of the testator, had killed testator's only child many years before; that the manner in which they had become responsible for the death of the baby was, that they had taken a cow from testator's premises the milk of which.

had been the baby's food, and that in consequence of being compelled to get another cow and change the milk the baby had died. The testator also said that the cow had been taken away from him in his absence and without his consent, and that he would have been glad to have bought the cow and paid more than she was worth if they had been willing to leave her with him. It is also testified to that the testator said that he had received a communication from the spirit land explaining the circumstances concerning the death of a neighbor's child, who had been burned to death in a barn. The testator said that the child procured matches from the kitchen and went to the hay-mow in the barn and buried itself in the hay and was smothered to death, and that it was not burned to death, as its parents had supposed. This alleged communication seemed to comfort the bereaved parents, who believed the child had been burned alive.

The foregoing summary of alleged spiritual manifestations embraces substantially all that is testified to by the non-expert witnesses in support of contestants' bill. The evidence also shows that the testator had heart disease, and that he had varicose veins, which caused one of his legs to be black from the knee down, and that he claimed he was receiving treatment for his ailments through spiritual agency, and that he was apparently better, at times, under such alleged treatment; but the evidence shows that if he received any relief at all it was only temporary, and that the general tendency was a decline in his physical condition and that he finally died of heart disease. It is shown by a number of witnesses that the testator would cry when talking about his deceased relations, and sometimes when witnesses would decline to attend spiritualist meetings he would manifest similar emotions. The substance of the foregoing facts and conditions was embraced in a hypothetical question to contestants' expert witnesses, and they answered that in their opinion, under the facts stated, the testator was insane on the subject of spiritualism.

On behalf of proponents fifty-five non-expert witnesses and twelve experts testified. The non-expert witnesses for proponents were laborers, mechanics, farmers, merchants, ministers and business men, who had known the testator from periods ranging from a few months to all their lives. Many of them were persons who had transacted various kinds of business with the testator. From a general view of this large mass of testimony the facts are brought out that the testator was an industrious, economical and successful business man; that he was uniformly methodical and careful in his business habits; that he attended personally to the leasing, renting and management of his farms, made contracts and settlements with his tenants, collected and marketed his rents and personally managed and superintended all the details of his business; that in addition to looking after his farming interests he was actively engaged in the banking business; that he gave personal attention to the management of the bank, was its vice-president and a member of the loaning committee, and that he actually and personally participated in the management of the affairs of the bank both before and after the execution of the will in question. These witnesses all testify that the testator was sane, and competent to transact intelligently and understandingly any ordinary business affair. The experts who testified for proponents expressed the opinion that the testator was sane at the time he made his will, in answer to a hypothetical question embodying, in substance, the same facts included in the question propounded to contestants' experts, with facts added which were developed by proponents' testimony. Proponents also offered in evidence the articles of faith as declared in the constitution and by-laws of the Illinois State Spiritualist Association, as follows:

"*First*—We believe in infinite intelligence.

"*Second*—We believe that the phenomena of nature, physical and spiritual, are expressions of infinite intelligence.

"*Third*—We affirm that correct understanding of such expressions, and living in accordance therewith, constitute the true religion.

"*Fourth*—We affirm that the existence and personal identity of individuals continue after the change called death.

"*Fifth*—We affirm that communication with the so-called dead is a fact, scientifically proven by the phenomena of spiritualism.

"*Sixth*—We believe that the highest morality is contained in the Golden Rule: 'Whatsoever ye would that others should do unto you do ye unto them.' "

Dr. George B. Warne testified that he was a practicing physician and professor in Hahnemann Medical College and engaged in the general practice of medicine; that he was a spiritualist, and had been for twenty years; that he was president of the Illinois State Spiritualist Association and vice-president of the National Spiritualist Association, and a trustee of both corporations. He testified that it was a part of the spiritualistic creed, believed by spiritualists, that spirits communicate with mortals by clairaudience,—that is, clear hearing, rapping, moving of tables or moving of furniture, trumpet seance, materialization, writing, spirit healing and materialization and spirit photography. He was asked, "What is the general belief of spiritualists in regard to progression after death, physically and mentally?" This question was objected to and the objection sustained.

From the foregoing statement it is apparent that there is utterly no foundation upon which a finding of general insanity of the testator can rest. In fact, it is conceded by contestants that the testator was sane on all subjects except spiritualism. Aside from this, the evidence proves, beyond a reasonable doubt, that in all the relations and affairs of life the testator was entirely rational, and acted with that judgment, prudence and foresight usually exercised by careful and successful business men. He was able to amass a large fortune for a man engaged in his line of business, and

to invest and manage it so as to avoid losses and preserve it intact until the day of his death. The only basis to be found in this record for questioning the testamentary capacity of the testator is the fact that the testator was a believer in spiritualism and the claim that this belief amounted to an insane delusion, under the influence of which the testator made the will in question. It must be admitted, under the proofs here, that the testator was an ultraist regarding all of the doctrines embraced in the articles of faith of the spiritualist association, but that there is any evidence in this record of insanity or insane delusions which cannot be accounted for by reason of Crumbaugh's belief in spiritualism cannot be maintained. Under the law of Illinois every person of requisite age, being of sound mind and memory, has the power to devise all of his property in any way he may elect; and when the validity of a will is challenged on the ground that the testator did not possess the requisite testamentary capacity, the ultimate and final question is, did the testator, at the time when the instrument was executed, possess the sound mind and memory required by section 1 of our Statute of Wills?

Courts and text writers have often considered the question what is and what is not a proper test of testamentary capacity. In *Campbell* v. *Campbell*, 130 Ill. 466, this court, after an extensive review of many authorities in this and other jurisdictions, laid down the following test: "The true inquiry in every case therefore is, did the person whose testamentary capacity is questioned, have, at the time of making his will, such mind and memory as enabled him to understand the business in which he was then engaged and the effect of the disposition made by him of his property? If he did, he was possessed of the sound mind and memory required by the statute; and all degrees of impairment of the mental faculties, or dementia, whether senile or produced by other causes, which destroy the testamentary capacity, will disqualify, whether it has reached the stage of absolute im-

becility or not." Any mere mental aberrations resulting in
the sub-normal exercise of the faculties, which do not result
in such impairment of the reason, judgment and memory as
to render a testator unable to understand the business of
making a will and the effect of the disposition to be made
of his property, will not vitiate the will. The existence of
delusions or delusional insanity is recognized, both by scien-
tists and legal writers, as a form of insanity which, when
shown to have existed in the testator at the time the will
was executed and to have controlled its execution, will avoid
the instrument. The existence of insane delusions on one
subject is not incompatible with sanity on all other subjects.
Contestants'· position in the case in hand is that the testator
was sane on all subjects except spiritualism, as to which
it is contended he had an insane delusion within the legal
meaning of those terms, and that the will in question was
the result of such insane delusion and is therefore void. It
therefore becomes necessary to examine with some particu-
larity whether, under the evidence, such contention can be
sustained.

An insane delusion which will render the sufferer in-
capable of making a will is difficult to define with exact
precision. A delusion is said to be a belief in a state or
condition of things the existence of which no rational person
would believe. (*In re Forman,* 54 Barb. 274; *Prather* v.
*McClelland,* 76 Tex. 574; *Schneider* v. *Manning,* 121 Ill.
376.) A delusion has also been defined as "a spontaneous
conception and acceptance as a fact of that which has no
real existence except in imagination and persistent adher-
ence to it against all evidence." (*Smith* v. *Smith,* 48 N. J.
Eq. ·566; *Rusk* v. *Megee,* 36 Ind. 69; *Philadelphia Trust
and Sav. Dep. Co.* v. *Drinkhouse,* 17 Phila. 23.) Again,
the same definition, in substance, is given in *Potter* v.
*Jones,* 20 Ore. 239, (12 L. R. A. 161,) as follows: "A
conception that originated spontaneously in the mind with-
out evidence of any kind to support it, which can be ac-

counted for on no reasonable hypothesis, having no foundation in reality and springing from a diseased or morbid condition of the mind." Another form of definition conveying substantially the same meaning is given in *Middleditch* v. *Williams*, 45 N. J. Eq. 726, (4 L. R. A. 738,) and is as follows: "If, without evidence of any kind, a testator imagines or conceives something to exist which does not exist in fact, and which no rational person would, in the absence of evidence, believe to exist, he is afflicted with an insane delusion." "Whenever a person conceives something extravagant to exist which has no existence whatever but in his heated imagination, and is incapable of being permanently reasoned out of that conception, he is under an insane delusion in a peculiar, half-technical sense of the term." (*Mullins* v. *Cottrell*, 41 Miss. 291; *Benoist* v. *Murrin*, 58 Mo. 307; *Stanton* v. *Weatherwax*, 16 Barb. 259.) A person who believes supposed facts which have no existence except in his perverted imagination and which are against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, is, so far as they are concerned, under an insane delusion. *In re Shaw*, 2 Redf. 107; *In re White*, 121 N. Y. 406.

In setting out these various definitions we do not do so with the purpose of giving our approval to each of them, but merely to show the different forms of expression that courts have used to express the legal conception of an insane delusion. Whatever form of words is chosen to express the legal meaning of an insane delusion, it is clear, under all of the authorities, that it must be such an aberration as indicates an unsound or deranged condition of the mental faculties as distinguished from a mere belief in the existence or non-existence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established

when the court is able to understand how a person situated as the testator was, might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. Thus, where the testator has actual grounds for the suspicion of the existence of something in which he believes, though in fact not well founded and disbelieved by others, the misapprehension of the fact is not a matter of delusion which will invalidate his will. *Stackhouse* v. *Horton,* 15 N. J. Eq. 202; *Potter* v. *Jones, supra; Martin* v. *Thayer,* 37 W. Va. 38; *Mullins* v. *Cottrell, supra.*

The case of *Wait* v. *Westfall,* 161 Ind. 648, (68 N. E. Rep. 271,) is an instructive case on this phase of the doctrine of insane delusions. There the testator believed that he could locate hidden treasure by means of a small metallic ball suspended on a thread. He spent a great deal of his time in going over the fields trying to locate the hidden metallic treasure, and holes were dug in so many places that they became a nuisance and had to be stopped. It was shown that a silver dollar hid under the carpet in a room could be located by the peculiar vibrations of the metallic ball when it was suspended over the silver dollar, and this circumstance offered some basis for the testator's belief that he could locate money buried in the ground by the same means, and the fact that there was this basis for the testator's belief, however erroneous or mistaken the conclusion drawn therefrom, distinguished the belief from an insane delusion. It is true that the bare fact that the metallic ball would indicate, by certain vibratory motions, where a silver dollar was, might be by most persons regarded as a very trifling circumstance upon which to predicate a belief that one could find treasure hidden in the earth in the same way, but it serves to show that the belief was not a spontaneous creation of a deranged mind. The following excerpt of the opinion of Mr. Justice Hadley in this case is pertinent to the question now under consideration:

"What tribunal occupied by finite beings is qualified to adjudge false, asserted forces of attraction and magnetism or the phenomena of mind, because incapable of demonstration, or that certain supernatural powers and influences do not exist because not in accord with an assumed standard of mental action? In all the ages of the world instruments and devices have been employed in locating minerals in the earth. The fact is notorious that there are many intelligent, conservative persons who claim the power of locating water in the earth by means of a forked stick, and thousands of wells located by them have been dug and are still being dug. It is equally a matter of common report that such a stick will point downward at particular places in the hands of some men and not in the hands of others. Many scholars and successful business men sincerely believe in spiritualism, and of being able, not by 'all but through the instrumentality of a few naturally qualified persons called 'mediums,' to converse with and be advised by the spirits of departed friends, and believe they recognize the voices and handwriting of the dead. Mental phenomena are as various as the hues of the autumnal forest. In *Chafin's Will,* 32 Wis. 564, it is said: 'Dr. Carver, a very intelligent medical witness, who had been in the western mines, testified: I have seen hundreds of men in the mountains who came there on dreams, including lawyers, doctors and priests. Business men here in Monroe have been and searched for minerals under the direction of clairvoyants.' Others believe in christian science; others in clairvoyance; others in the transmigration of souls, and others in witchcraft. To affirm or deny the truth of these things proves nothing, and demonstrates the individual to be neither a sage or a fool. Who shall be the judge whether the mind that accepts or reflects them is the truly sane mind? If we affirm that witches do not ride broomsticks and practice their evil arts upon us, and that there are no witches, then we have Blackstone, the father of our common law, Chief Justice Mathew

Hale, Coke, Sir Francis Bacon, Richard Baxter, John Wesley, Martin Luther, Cotton Mather, and a host of other eminent jurists and savants, against us; encyclopedias; Nevin's Witchcraft in Salem Village; Upham's Salem Witchcraft; Campbell's Lives of the Chief Justices, vol. 2. Early in the history of our jurisprudence much difficulty, for the reason above suggested, was experienced by the courts in fixing a standard of intellect by which testamentary capacity could be determined, and legislative bodies were not inclined to relieve the courts of their embarrassment. For instance, our statute for more than a half century has provided that all persons, except infants and persons of unsound mind, may make a will. Similar statutes have long prevailed in other States of the Union and in England. In construing these statutes the courts of both this country and England were at first disposed to hold that any mind possessed of an eccentricity, aberration or erratic trend, such as amounted to an insane delusion, was not a sound mind within the meaning of the statute, and hence incapable. This doctrine has long since been repudiated by the courts of England, and for the most part, at least, by the courts of this country,—certainly by this State since *Teegarden* v. *Lewis,* 145 Ind. 98; 40 N. E. Rep. 1047; 44 id. 9. Under the law as now settled, capacity is not determined by what one believes nor by the character of the horrid tales he can tell. The test is, does there remain in the subject an untrammeled intellect, sufficiently strong and rational to know the value and extent of his property, the number and names of those who are the natural objects of his bounty, their deserts with reference to their conduct and treatment toward him, and memory sufficient to carry these things in mind long enough to have his will prepared and executed. See cases collected in *Teegarden* v. *Lewis,* 145 Ind. 98; 40 N. E. Rep. 1047; 44 N. E. Rep. 9; at page 103, 145 Ind.; page 1048, 40 N. E. Rep."

In the late case of *Scott* v. *Scott,* 212 Ill. 597, we held
that a belief in Swedenborgianism and an enthusiasm mani-
fested in propagating that faith furnish no evidence of mon-
omania, insane delusion or insanity.    There the testator
devised the greater portion of his property to a corporation
which was organized for the sole object of printing, pub-
lishing and circulating the theological works and writings
of Emanuel Swedenborg, and the only evidence of delusion
was the belief of the testator in the teachings of the so-called
Swedenborgian church.    In disposing of the contention
made we said (p. 603) :   "The great majority of civilized
human beings believe in the existence of a life beyond the
grave.   Based upon that belief, many religious creeds, dif-
fering widely, have been established.   The fact that an in-
dividual holds any particular belief in regard to a future
state of existence cannot, of itself, be evidence of an insane
delusion or monomania.   An insane delusion is a belief in
something impossible in the nature of things, or impossible
under the circumstances surrounding the afflicted individual,
and which refuses to yield either to evidence or reason.
(*Riggs* v. *A. H. M. Society,* 35 Hun, 656; *State* v. *Lewis,*
20 Nev. 333; *Rush* v. *Megce,* 36 Ind. 80.)   We have here-
tofore said that 'insane delusion consists in the belief of
facts which no rational person would have believed.'   (*Nice-
wander* v. *Nicewander,* 151 Ill. 156; *Schneider* v. *Manning,*
121 id. 376.)   Such a delusion does not exist unless it is
one whose fallacy can be certainly demonstrated, for except
such demonstration can be made it cannot be said that no
rational person would entertain the belief.   Consequently
no creed or religious belief, in so far as it pertains to an ex-
istence after death, can be regarded as a delusion, because
there is no test by which it can be tried and its truth or
falsity demonstrated.—*Gass* v. *Gass,* 3 Humph. 278; *Bu-
chanan* v. *Pirie,* 205 Pa. St. 123; *Orchardson* v. *Cofield,*
171 Ill. 14."

Tested by the rules laid down in the foregoing authorities, it is clear that the testator in the case at bar was not the victim of an insane delusion, within the meaning of the law. In the light of these authorities let us examine the occurrences which contestants rely on as showing that the testator was controlled by an insane delusion. Take, for example, the fact that the testator said that his brother and sister-in-law caused the death of his only child. The evidence explained what the testator meant. The child was being fed from the milk of a cow belonging to the testator's brother. It is not denied that the owner of the cow took it away from the testator's home without his consent, thereby making it necessary to feed the child upon the milk of another cow. It is not denied that the child sickened and died after the change in its food. Who would say that there was no evidence whatever for the charge that the taking away of the cow was the cause of the baby's death? It is a matter of common knowledge that physicians and careful mothers exercise great care in changing the food for infants, and the fact that the testator may have believed that the change from the milk of one cow to that of another was the cause of the sickness and death of his child has some reason in it. If there had been no such circumstance as the child being fed upon the milk of this particular cow and the whole matter were a figment of pure imagination, then there might be some reason for saying that it originated in a disordered brain. But such is not the proof. It makes no difference, with this view, that the testator believed that the facts in relation to the death of his child had been revealed to him by spiritual communication. There is nothing connected with this circumstance showing that the testator's belief in regard to spiritual communication was any different from the belief of spiritualists in general. The preservation of the testator from threatened harm in connection with the blowing of the stump, the burning of the brush and his falling near a step are other occurrences which illustrate

how, in the mind of the testator, he connected events in his experience with his belief in spiritualism. His belief in spiritualism led him to account for his preservation from harm by means of spiritual guidance, while another person no more rational than Crumbaugh, but who did not believe in spiritualism, would account for the same phenomena in some other way. The testator did not imagine that he was in a field and that there was a person there blowing out stumps with dynamite and that a piece of the stump was thrown in such a way that it would have struck him if he had not shifted his position, but there was, in fact, such a field, and in it were stumps which were being blown out, and the testator was there when an explosion of dynamite occurred, and it is testified to by the witness that a piece would have struck the deceased if he had not shifted his position just before the explosion. Now, all that is left of the transaction which is not susceptible of proof is the fact that the testator believed that he was led to shift his position by his guiding spirit. To hold that this is evidence of an insane delusion, when reduced to its last analysis, is to hold that a belief in spiritualism is, in and of itself, an evidence of insanity and that no one who believes in the articles of faith as promulgated by that organization is competent to make a valid testamentary disposition of his property. There is not in this record a scintilla of evidence of insane delusions in the testator outside of the bare fact that he believed in the general doctrine of the spiritualist organization. This is not insanity and it is no evidence of a want of testamentary capacity.

In *Whipple* v. *Eddy*, 161 Ill. 114, this court passed on the question whether a mere belief in spiritualism was evidence of insanity. It was there said (p. 122): "The fact that a person is affected with insanity or labors under some delusion, believes in witchcraft, clairvoyance, spiritual influences, presentiments of the occurrence of future events, dreams, mind reading, etc., will not affect the validity of his

will on the ground of insanity. (1 Redfield on Wills, 79,
note 9; *Chaffee will case,* 32 Wis. 557; *In re Smith,* 52 id.
543; *Brown* v. *Ward,* 53 Md. 423.) Manifestly, a man's
belief can never be made a test of sanity. When we leave
the domain of knowledge and enter upon the field of belief
the range is limitless, extending from the highest degree
of rationality to the wildest dream of superstition, and no
standard of mental soundness can be based on one belief
rather than another. What to one man is a reasonable belief
is to another wholly unreasonable, and while it is true that
belief in what we generally understand to be supernatural
things may tend to prove insanity under certain circum-
stances, it is a well known fact that many of the clearest
and brightest intellects have sincerely and honestly believed
in spiritualism, mind reading," etc.

If it be said that the testator believed that Bright Eyes
and the spirits of other deceased friends appeared and held
communication with him, in and out of the seance room;
that the testator believed in spiritual photography and that
he had pictures of deceased persons made in this way; it
may be replied that there is in this no departure from the
usually accepted faith of the spiritualistic organization, as
shown by the articles of faith testified to by Dr. Warne,
whose testimony is wholly uncontradicted. It may be said
that the testator believed that his son, who died in infancy,
had grown to manhood in the spirit land, and that there
is no evidence that spiritualists believe in progression or
growth after death. This point is not available to contest-
ants, since proponents asked Dr. Warne to state the belief
of his association on this point, and the contestants objected
and the objection was sustained. Contestants will not be
permitted to profit by the absence of evidence which was
excluded on their objection.

The expert witnesses who were examined for contest-
ants expressed the opinion that the testator was insane in
answer to the following hypothetical question: "Assum-

ing, Doctor, that James T. Crumbaugh, at the time he signed the supposed will in question, was seventy years of age; that for the greater part of his life he had been a farmer and very active but for the last fifteen years or more had lived in the village of Leroy; that he was, and for a number of years had been, afflicted with varicose veins, which caused his right leg to become black from his knee to the foot; that he was, and for a number of years had been, troubled with heart disease, of which he died a few years later; that about three years before the drawing of the will he became a spiritualist; that previous to that time he expressed himself as being very much opposed to spiritualism; that after he became a spiritualist his social life changed; that he cared chiefly for the society of spiritualists; that when talking upon the question of spiritualism he sometimes became excited and would often break down and cry; that he thought he heard the voices of the dead in the seance room and out of it; that he thought he saw the forms of the dead; that they stood before him and conversed with him, both in the seance room and out of it; that his dead mother came up through the floor in the seance room and put her arms around his neck and kissed him; that his son, whom he called 'Bright Eyes' and who died at six weeks of age, came back to him in the form of a man and patted him on the cheek; that he thought he had a spirit guide, who directed him in his affairs and who came to his bed each night and told him good night; that these conditions existed both before and after the signing of the supposed will;—what would you say as to whether or not, at the time of executing the supposed will, he was sane or insane on the subject of spiritualism?"

It will be noted that the foregoing question embraces nothing in the physical condition of the testator that could have any tendency to affect his mental faculties. While varicose veins and heart disease are included in the question, still these ailments had nothing whatever to do with the man's mind. If Crumbaugh was suffering from phys-

ical ailments which had a tendency to produce mental aberrations, then such results would be as liable to appear at one time as another and in connection with one transaction or line of thought as another, and, as we have already shown, the testator was in the full possession of all of his mental vigor before as well as during the three years intervening after the will was made and before his death. It cannot be said with any show of reason that the varicose veins of his right leg, causing it to become black from the knee to the foot, or the further fact that he was troubled with heart disease, had the remotest effect upon the testator's testamentary capacity at the time when the will was executed, or at any other time, either before or after its execution. Equally unimportant and irrelevant are the supposed facts that until three years before the making of the will testator had been opposed to spiritualism and that afterwards he cared chiefly for the society of spiritualists. With these trifling and unimportant facts eliminated from the hypothetical question, there is nothing left in it that is not embraced within the articles of faith which are believed by spiritualists generally, so that, in effect, contestants' experts testify merely that in their opinion one who believes in the doctrines of the spiritualist organization is, for that reason alone, insane on that subject. In fact, several of the physicians who testified for contestants frankly admitted that anyone who believed in spiritualism was insane on that subject. For instance, Dr. Hart says: "I would say that, regardless of his physical condition,—if he had no varicose veins and no trouble with his heart,—if he believed in spiritualism, as stated in the hypothetical question, I would believe from that alone that he was insane on the subject of spiritualism. Any man who believes in spiritualism as Mr. Crumbaugh believed, whether he was sound or unsound physically, I would believe him insane." Other physicians made similar explanation. Whatever weight the opinion of these learned physicians might have as tending to establish that the testator was insane be-

cause of his belief in spiritualism in a purely scientific and theoretical sense, they cannot be regarded as any evidence whatever tending to establish the existence of insane delusions, within the legal meaning of those terms. Where the proof shows, as in this case, facts which prove, beyond all doubt, that a testator was in the full possession and proper exercise of all of his mental faculties, an opinion of an expert, based on a hypothetical state of facts not inconsistent with legal sanity, can have little or no weight, and in the absence of any other evidence of insanity will not warrant the court in refusing to direct a verdict notwithstanding such opinions.

The conclusions we have reached in this case are not in conflict with our previous decisions. *Orchardson* v. *Cofield,* 171 Ill. 14, is a case where the jury found that the testatrix possessed testamentary capacity but that the will was the result of undue influence, and the verdict was upheld. The belief of the testatrix in spiritualism in that case was important as bearing upon the undue influence exercised over Mrs. Merrick by Orchardson. There the evidence showed that a woman eighty-three years old was induced to marry a spiritualist medium fifty-seven years old, and afterwards to make a will in his favor devising a large estate to him, and that she believed that she was directed to contract this unnatural marriage relation, and to make the will, by the spirit of her former husband. There is not a particle of evidence in this record that the testator ever claimed to have had any spiritual direction from Bright Eyes, or any other spiritual manifestation, directing or suggesting the making of the will in question. On the contrary, he expressly declared in the will itself that "I have not been influenced by any person or spirits, but have only made same after many weeks of study, thought and consideration," etc., thus showing, as clearly as language can make it appear, that the testamentary scheme to build a church and a public library in his city,—the former, especially, for the benefit of the spir-

itualist organization and the latter for the benefit of the public in general,—was a plan originated, worked out and matured in the mind of the testator, uninfluenced by any persons or spiritual manifestations whatever.

The case of *American Bible Society* v. *Price,* 115 Ill. 623, relied on by contestants, is not in conflict with the views we have expressed in the case at bar. It was there held that when a testator has an insane delusion in regard to one who is an object of the testator's bounty, which causes him to make a will which he would not have made but for such delusion, such will cannot be sustained. So, also, it is held that where a person has an insane delusion in regard to his duty or moral obligation to make a will in favor of a particular person, corporation or society, and a will is the result of such insane delusion, it cannot be sustained. This is good law, and if we should strike out "insane delusion" in the above propositions and insert *"religious belief"* it would fit this case, but it would not then be the law. It can never be held that because a testator believes in the doctrines of a particular church, and because of his preference for the one rather than the other he makes his will with a view of promoting the interests of his peculiar denomination, this fact is to be accepted as evidence of insanity. The owner of an estate may devise it to aid the Methodist, Baptist, Presbyterian, Catholic, Universalist, Swedenborgian, or any other religious organization he may choose, or he may, if it meets his wishes, like Stephen Girard, give his property to a nonsectarian school and provide that no ecclesiastic, missionary or minister of any sect whatever shall ever hold or exercise any station or duty whatever therein, nor be allowed, even as a visitor, to enter the school or to go upon the premises, and such will is valid and will be upheld. *Vidal* v. *Girard's Exrs.* 43 U. S. 126.

It is a constantly recurring source of error in will cases that there is a strong inclination in courts, and especially in juries, to do by their judgments or verdicts what they would

have advised had the testator consulted them beforehand. One who is strongly imbued with the belief that the propagation of spiritualism is detrimental to society, and that there is nothing in the claims of its adherents that cannot be accounted for by fraud and deception on the one hand and credulity on the other, will be liable to accept any plausible theory upon which he may find a verdict correcting the supposed inequities of the testator's disposition.

The verdict of the jury in this case is entitled to the weight and consideration that is accorded to a verdict in a law case; but a verdict in a law case cannot stand without some evidence to support it. Here, as we have seen, there is none, unless we are prepared to say that the bare fact that the testator was a spiritualist proves that he was insane. Such a holding would find no support in the law.

Proponents requested the court to direct a verdict in their favor, which was refused. If there was evidence requiring the court to submit the case to the jury the refusal of the request was not error. If, upon the whole case, there was evidence fairly tending to support contestants' bill the motion was properly denied. After giving this case the careful examination which its importance requires, we are firmly convinced that there is no evidence here even raising a suspicion in our minds that the testator was not entirely sane and as competent to make a will or transact any other kind of business as the average business man. We have examined the evidence with great care, and when it is all summarized and reduced to its final results it only proves that Crumbaugh was a believer in spiritualism; that he thought that he was doing a philanthropic work for his friends in Leroy by leaving this estate to establish this church and library, and however much one may differ from him as to the advisability of such a devise, that has nothing to do with the legal status of the will. If the testator had the capacity to make the will he had the capacity to select the beneficiaries. This he has done, and there the matter must rest.

The court erred in refusing to direct a verdict for proponents, for which the decree must be reversed, which is accordingly done and the cause remanded to the circuit court, for further proceedings not inconsistent with the views herein expressed.          *Reversed and remanded.*